## HUMPHREY v. COMMISSIONER OF INTERNAL REVENUE.

### No. 8318.

Circuit Court of Appeals, Ninth Circuit.
June 21, 1937.

**156**

Joseph P. Tumulty and Walter E. Barton, both of Washington, D. C., and Adolphus E. Graupner, of San Francisco, Cal. (Robert M. Searls and Willard L. Pope, both of San Francisco, Cal., of counsel), for petitioner.

Robert H. Jackson, Asst. U. S. Atty. Gen., and Sewall Key, Maurice J. Mahoney, and Francis I. Howley, Sp. Assts. to Atty. Gen., for respondent.

Before WILBUR, MATHEWS, and HANEY, Circuit Judges.

WILBUR, Circuit Judge.

The taxpayer in this case claimed a deduction from his gross income by reason of the loss of $126,993.66 during the taxable year ending December 31, 1929. The Commissioner contends, and the Board of Tax Appeals found, that the taxpayer was not entitled to any deduction. The facts were stipulated and are set forth in the findings of the Board of Tax Appeals.

The taxpayer, together with A. J. Crocker Company, the Provident Security Corporation, J. A. McCarthy, and Thornton Wilson, trustee, entered into an agreement as a joint venture to share in the profits and losses in proportion to their respective contributions in a public contract for the construction by the county of Alameda of an underpass tunnel under the Oakland Estuary. This group we will call the syndicate.

The agreement between the members of the syndicate, except as to losses, is an oral one. The agreement as to sharing losses was contained in a letter dated April 24, 1925, in part as follows: " * * * but it is distinctly and positively understood that the loss if sustained is to be paid as follows: 25% of any such loss to be paid by A. J. Crocker Co.; 35% of any such loss to be paid by the Provident Security Corporation; 35% to be paid by J. A. McCarthy and Mr. W. F. Humphrey."

McCarthy and Humphrey were interested in the proposed construction because together with members of their families they owned between 40 and 50 per cent. of the capital stock of the Old Mission Portland Cement Company and desired that the 200,000 barrels of cement estimated as necessary for the construction of the tunnel should be purchased from that company by the contractor, and because it was thought that the construction contract would result in some additional profit to the syndicate. Further evidence as to the syndicate agreement is contained in a letter written in order to secure a loan of $300,000 from the Old Mission Portland Cement Company to be deposited with the Surety Company which was to write bonds as surety for the construction contract.

This letter was written by A. J. Crocker and signed by him, by the Provident Security Corporation, and by J. A. McCarthy, acting for himself and the taxpayer, Wm. F. Humphrey, and stated that the contract for the construction of the tunnel was to be taken in the name of the A. J. Crocker Company, "and that said A. J. Crocker Company will hold the contract and all proceeds thereof in trust for the undersigned in the following proportions, to wit: A. J. Crocker 25%; Provident Security Corporation 35%; J. A. McCarthy 35%, 5%." Further evidence as to the syndicate agreement was contained in an agreement entered into between the Old Mission Portland Cement Company (first party), Louis Schoenburg, the A. J. Crocker Company, J. A. McCarthy, Harry Lesser, A. J. Crocker (third party), which stated, that "in case any loss is collected from any one of the above named parties, either in his personal or corporate capacity, such party will have a right to the contribution from the remaining parties in proportion to their respective interest in such contract." Before it would become surety on the construction contract, the surety company required and obtained, in addition to the $300,000 already mentioned, a further deposit of $200,000, being a total of $500,000, and the additional $200,000 was deposited by the Old Mission Portland Cement Company, pursuant to an agreement between the syndicate members. The agreement between the Cement Company and the syndicate members also provided that in the event any part of the sum of $500,000 deposited to indemnify the Surety Company was used that "each one of the third parties hereby severally agrees and is severally liable to repay * * * such proportion of all or any part of such $500,000 that may be so used as his interest in said estuary subway contract bears to the subway contract."

J. A. McCarthy acted throughout for himself and the taxpayer. In order to carry out the syndicate agreement the California Bridge & Tunnel Company was organized on May 18, 1925, and its stock was subscribed for by the members of the syndicate in proportion to their interests in the syndicate agreement. Among others 5 per cent. of the stock was subscribed for by Thornton Wilson as trustee, 35 per cent. for the taxpayer and J. A. McCarthy. The par value of the stock of the corporation was $500,000 and each member of the syndicate gave a promissory note to the corporation for the par value of the stock subscribed for by him. In order to secure cash capital for the construction of the underpass tunnel the Tunnel Company executed its note for $500,000 to a bank and gave the promissory notes of the stockholders as collateral security.

In the meantime the A. J. Crocker Company, one of the syndicate, had made a bid for the syndicate in its own name of $3,-380,000 and was awarded the contract. In order to execute the contract therefor it was necessary to give the County of Alameda two bonds of $1,942,000 each, which were executed by the aforesaid surety company in consideration of its premium and the deposit of the aforesaid $500,000 in cash with a pledgeholder and the execution of indemnity bonds to it by some members of the syndicate.

Thereafter, others engaged in the contracting business who were purchasers of cement from the Old Mission Cement Company objected to the taxpayer who was one of the officers of the Cement Company engaging in the contracting business. To meet this objection, on September 23, 1926, the 1,750 shares of stock of the Tunnel Company standing in the name of J. A. McCarthy, but jointly owned by him and the taxpayer, were transferred to the Mission Land & Cattle Company (hereinafter called the "Cattle Company"), all of whose stock was owned by J. A. McCarthy and the taxpayer in equal proportions. J. A. McCarthy had executed his note to the Tunnel Company for $175,000 in payment for the 1,750 shares jointly belonging to him and the taxpayer. This note had been hypothecated by the Tunnel Company, with others, in order to secure $500,000 capital for the performance of the contract. The Cattle Company now executed its note dated October 8, 1926, for the same amount, which was hypothecated for that purpose. The construction contract was sublet by the Crocker Company to the Tunnel Company on July 2, 1925, but the County did not recognize the subcontractor. This, however, did not prevent the subcontract from becoming effective although the county was able, notwithstanding the subcontract, to hold the original contractor and its bondmen liable for the performance of the contract.

It should be observed further that the taxpayer was a silent partner in the syndicate enterprise and that all documents executed on his behalf were executed by J. A.

McCarthy in his own name. The subscription for the Tunnel Company stock for the 1,750 shares was signed by J. A. McCarthy. The stock certificate made out for these shares was in the name of J. A. McCarthy for 1,748 shares, two shares being issued to others. The note given in payment for the 1,750 shares was signed by J. A. McCarthy and for 250 shares by Thornton Wilson. The first time the taxpayer became entitled to an interest in the enterprise on the face of the written records was when the Tunnel Company stock was issued to the Cattle Company and then his apparent interest was only as a stockholder in the Cattle Company. His name did appear in the letter of April 24, 1925, supra, which passed between the syndicate members which indicated their interest. In the communication addressed to the Old Mission Portland Cement Company, McCarthy appears as the owner of 35 per cent. interest, and there is no showing of the interest of Humphrey who was president of the Old Mission Portland Cement Company at that time.

In the agreement with the Old Mission Portland Cement Company above referred to, Humphrey was not a party except as represented through J. A. McCarthy. Humphrey's name also appears in the resolution adopted by the board of directors of the Tunnel Company on July 15, 1929, at a meeting called for the purpose of considering the payment of $500,000 note due to the Anglo Bank. It was then agreed by the taxpayer and J. A. McCarthy to assume the $175,000 indebtedness evidenced by the aforesaid promissory note of the Cattle Company, and also that each assume $4,605 of the indebtedness of F. S. Smith, trustee, upon the $25,000 note, the balance being assumed by the other members of the syndicate. This resolution proceeds to fix the amount of the indebtedness due from each member of the syndicate on its indebtedness of $506,833.56 and recites that this amount is $6,833.56 in excess of the indebtedness due from the members of the syndicate to the Tunnel Company, that the portion of the taxpayer and McCarthy was $1,253.74 each, and that they had already paid on that account $1,399.92 each. The Tunnel Company completed the underpass

in July, 1929 at a loss of approximately $750,000. The taxpayer's portion of the loss according to the syndicate agreement, was 17½ per cent. thereof, or $126,993.66. It is this loss that the taxpayer claims a right to deduct for the taxable year 1929.

The $500,000 note given by the Tunnel Company secured by the individual promissory notes of the members of the syndicate, together with $6,833.56 interest thereon, was then due and unpaid. In order to pay this debt the members of the syndicate borrowed from the Anglo & London-Paris National Bank, which held the note, upon their individual promissory notes, sums in proportion to their syndicate interests, amounts sufficient to pay this note of $506,833.56. The amount borrowed by the taxpayer for that purpose was $93,358.74, which was paid to the Tunnel Company on July 30, 1929, and used by it on that day to pay off the above mentioned note. Upon payment of the note of $500,000 with interest the note of the Cattle Company for $200,000 which had been given by the latter to the Tunnel Company was surrendered, that indebtedness having been assumed and paid by the taxpayer and J. A. McCarthy. [1] To pay the balance of the loss of the Tunnel Company amounting to $188,166.44, the Tunnel Company gave its note for that amount to the Anglo & London-Paris National Bank. The payment of this note was guaranteed by the members of the syndicate in proportion to their interests in the loss as fixed by the syndicate agreement. The taxpayer's guarantee was 18.42 per cent. of the total. On November 30, 1929, the taxpayer paid on this note the sum of $2,763, and on December 2, 1929, gave his personal promissory note to the bank for $29,472 in satisfaction of his contract of guaranty. On December 31, 1929, the taxpayer gave a new note for $122,830.74 to the same bank to cover the balance of the indebtedness theretofore evidenced by his promissory notes for $93,358.74 and $29,472.

The petitioner used the cash method of accounting in keeping his books and making his return for income tax purposes. He claims that when he borrowed the sum of $93,358.74 and paid that amount in cash to the Tunnel Company to be used by it in

---

[1] The promissory note of the Cattle Company hypothecated by the Tunnel Company was $200,000 and represented the purchase price of 2,000 shares of stock of the Tunnel Company, 1,750 of which had been subscribed by McCarthy and 250 of which had been subscribed by Thornton Wilson as trustee, representing the 5 per cent. which was not covered in the syndicate agreement.

paying its promissory note of $500,000, this amount was paid on a loss and that he was consequently entitled to a deduction thereof from his gross cash income for 1929. He also claims that when he gave his personal promissory note for $29,472 to extinguish his liability as guarantor upon the Tunnel Company's note for $188,166.44 he in effect made a cash payment to extinguish that obligation although the guaranty obligation and the note were made at the same bank. Petitioner also claims a deduction as a loss of $2,763 cash paid to the Tunnel Company on November 30, 1929, and $1,399.42 paid to the bank on July 5, 1929, on account of his loss.

The taxpayer claims that all these transactions were for the purpose of carrying out the initial agreement between the members of the syndicate and that the payments of losses made were in pursuance of the obligations thus assumed and, consequently, that he is entitled to a deduction of these payments as a loss by reason of his participation in the syndicate agreement. There is no evidence that the form of corporate obligations assumed by the parties was intended to alter the relation of the syndicate members with reference to the sharing of profit or loss. On the contrary, the taxpayer testified in effect that he considered the syndicate agreement binding and that he made his payments in pursuance of that primary obligation. Of course, as far as third parties contracting with a corporation are concerned there is no doubt that they had a right to rely upon such corporate organization and enforce the liability of stockholders, but this right of third persons was not inconsistent with the idea that between themselves the syndicate members were at all times joint adventurers.

The Board of Tax Appeals did not deal with the problem from the standpoint of the syndicate agreement, but assumed that the syndicate agreement became merged in the stock subscription and contract agreements entered into in connection with the organization and business of the Tunnel Company. It further assumed that the agreement by which the Cattle Company took over the capital stock of the taxpayer and J. A. McCarthy in the Tunnel Company was not a mere nominal change of ownership, but an actual transfer, thus disregarding the testimony in support of the taxpayer's contention that this was merely a nominal arrangement. The Board of Tax Appeals worked out the relationship of the parties and their liabilities on this theory and concluded that by reason of the substitution of the obligations of the Cattle Company for the obligations of the taxpayer and A. J. McCarthy the payment by the taxpayer of the obligations of the Cattle Company was a voluntary payment not deductible as a loss. It therefore held that the loss to him would be realized, if at all, when he sold the stock of that company.

■ In fixing the net income of the taxpayer the income should be fixed by the transactions of the taxpayer and the law of the state applicable thereto. If the taxpayer reasonably believed himself bound by the syndicate agreement to make the payments he did make because of the losses incurred in constructing the underpass tunnel, and if he made such payments in good faith on the obligations of the syndicate, he has suffered a loss in the enterprise which in fact decreased his net income and which he should be entitled, under the statute, to deduct from his gross income in estimating the net income subject to taxation. The fact that the responsibility of the taxpayer to pay these losses might be worked out on some different legal theory than that on which he made the payments for such losses should not deprive him of his right to deduct the loss. The Commissioner should not prevail in his contention that the taxpayer might have defeated the claims of his creditors and of his associates by making a defense to their claims which the taxpayer believed was untenable. He should not be compelled to hide behind the skirts of the Cattle Company to the injury of that company, particularly where the Cattle Company had shouldered the responsibility of the transaction at the instance of the taxpayer.

■ The law taxes the income of the taxpayer. While the burden is on him to show a loss, it is clear that the amounts thus paid out in fact diminished his income. We think the taxpayer is entitled to have deducted from his income such cash payments as he made by reason of the losses he suffered, as he believes, because of his responsibilities under his syndicate agreement. The responsibility for correctly determining the facts lies with the Board of Tax Appeals. Whether or not there was a novation when the parties organized the corporation to construct the tunnel is one of intent, and therefore is a question of fact. There was no testimony on the sub-

ject of intent other than that of the taxpayer to the effect that he believed and acted on the belief that the syndicate agreement was still obligatory upon its members.

Because of the interblending of fact and law in the conclusion as to such novation and as to the effect of the transfer by the taxpayer of his stock in the Tunnel Company to the Cattle Company, we now approach the problem from a different angle.

■ Assuming, as the Board of Tax Appeals did, that the obligations of the taxpayer shifted and changed in accordance with the various transactions entered into for the financing of the Tunnel Company and the payment of its losses, we have to take into consideration a peculiar statutory law of California in force when these transactions occurred under which a stockholder is liable for his proportion of all indebtedness created by a corporation while he is a stockholder. Civ.Code Cal. § 322. This law was repealed in 1930, but was in force during the entire period involved in this case. It follows that the taxpayer was at all times liable for his prorata of the $500,000 indebtedness incurred by the Tunnel Company when it borrowed that amount from the bank as capital for the construction work. He was also liable to the Tunnel Company for the same amount on the subscription agreement executed on his behalf by J. A. McCarthy. This obligation was represented by the note which McCarthy had given the Tunnel Company and which the Tunnel Company had deposited with the bank. The taxpayer was thus directly obligated to the bank by reason of his interest in the corporation stock and to the same amount by reason of the promissory note executed on his behalf by J. A. McCarthy (that is, one-half of the $175,000 note). These obligations were not extinguished until the petitioner borrowed the $93,358.74. He paid that amount to the Tunnel Company for the purpose of paying it on the $500,000 note and it was used for that purpose. At the time this money was paid the stock of the Tunnel Company was worthless. The money was borrowed by the taxpayer and paid for the purpose of meeting his obligations on the syndicate agreement, and his obligations on the $500,000 note of the contract, and on the promissory note of J. A. McCarthy for which he was obligated. It is clear that such payment was not voluntary.

A closer analysis of the situation we think is not required. It is clear that the intervention of the Cattle Company into the transaction was merely for the convenience of the taxpayer and his associates, and that in determining whether or not the payment of the taxpayer was voluntary or made on behalf of the Cattle Company, it should be recognized that the transaction was nominal only. It is not intended to and did not relieve the taxpayer from his responsibility to his associates in the syndicate. If we ignore the syndicate agreement as the basic responsibility of the taxpayer and follow the corporate transaction down to the time of payment and also ignore the nominal character of the Cattle Company's agreement, there was still a primary responsibility of the taxpayer for the indebtedness due upon the $500,000 note of the Tunnel Company. Civ.Code Cal. § 322.

On this subject the Board of Tax Appeals in its opinion makes the following statements:

"The parties agree that in California a stockholder is liable for his proportionate part of the debts of the corporation in which he owns stock contracted during the period of his stockowning, nevertheless the petitioner is not entitled to deduct any amount on this theory. The Cattle Company is liable for its debts to the Tunnel Company and if the Cattle Company is not able to pay that debt such fact does not appear in this record. * * * The Cattle Company was liable as a stockholder of the Tunnel Company for the latter's indebtedness. If the petitioner were to argue that as a stockholder of the Cattle Company he was liable for a part of this additional indebtedness and for the loss which the payment represented to him, the answer would be that any payment which he made in this connection would likewise represent additional investment in the stock of the Cattle Company. Thus, on no theory that has been suggested would the petitioner be entitled to deduct the loss which he claims. * * *

"The Tunnel Co., in taking over the contract for construction of the tube agreed to indemnify and hold harmless the general contractor. The loss of the Tunnel Company was paid without recourse to the bonds or deposits made before it was organized. The Cattle Co., as one of the stockholders of the Tunnel Co., was liable for its share of the loss of the Tunnel Co.

There is nothing on the record to indicate that it was not at all times able to meet its obligations. It thus stood between the petitioner and any possible loss on his part. But the petitioner voluntarily assumed a part of the liability of the Cattle Co., to the Tunnel Co."

This reasoning of the Board of Tax Appeals is based upon an erroneous interpretation of the California law with relation to stockholders' liability for it assumes that the stockholders' liability is not a primary obligation, and that although the taxpayer, as a stockholder of the Cattle Company, was liable with the Cattle Company for the debt of the Tunnel Company, such obligation was in the nature of a guaranty, whereas, under the California law the obligation of the stockholder is primary and direct. As was stated by the Supreme Court of California in Ellsworth v. Bradford, 186 Cal. 316, 199 P. 335, 336: "The statutory liability, as has been repeatedly held by this court, is an independent original liability of the stockholder to the creditor which can be enforced directly against the stockholder, quite independently of any judgment against the corporation, and is not dependent upon an adjudication of indebtedness in an action against the corporation, but upon the actual existence of such indebtedness. Under the provisions of the California law stockholders are held to be primarily liable as principal debtors and not as sureties or guarantors." See, also, Buttner v. Adams (C.C. A.) 236 F. 105; Eva v. Andersen, 166 Cal. 420, 137 P. 16; Thomas v. Matthiessen, 232 U.S. 221, 34 S.Ct. 312, 58 L.Ed. 577; 6-A Cal.Jur. 1002, 1003. As stated in Young v. Rosenbaum, 39 Cal. 646, stockholders are not sureties of the corporation but are principal debtors.

It should be observed here that if there is any doubt as to the primary responsibility of the taxpayer upon the $500,000 note of the Tunnel Company in which the Cattle Company held stock, it is removed in this case by the fact that the Cattle Company had given a note to cover its portion of the indebtedness evidenced by the $500,000 note as security therefor, and that the taxpayer, as a stockholder of the Cattle Company, was primarily responsible for the note of the Cattle Company. Because of this primary obligation it is immaterial as to the exact arrangement made between the Cattle Company and the taxpayer in connection with the transfer to the taxpayer of the worthless stock of the Tunnel Company and the assumption of indebtedness by the taxpayer which was due to the Tunnel Company. The obligation already existed, and the transfers of stock and the payment of the notes was for the purpose of taking care of this primary responsibility. The payments so made were not voluntary.

It follows from what we have said that the sum of $93,358.74 paid in cash by the taxpayer on July 30, 1929, to the Tunnel Company to be applied on the $500,000 note of the Tunnel Company was a loss which he was entitled to deduct from his gross income for the year 1929 under section 23(e) (2) of the Revenue Act 1928 (26 U.S.C.A. § 23 note).[2] Where a taxpayer is on the cash basis, the fact that he borrowed money with which to pay a loss does not postpone the right to deduct the loss until the payment of the loan. Crain v. Com'r (C.C.A.) 75 F.(2d) 962, 963.

The payment of $29,472, which the taxpayer claims à right to deduct as a loss, was made in a different way. The taxpayer guaranteed that portion of a loan of $188,166.44 which was made on July 30, 1929. He thus substituted for his stockholders' liability to the creditors of the Tunnel Company his obligation as a stockholder to the Anglo & London-Paris National Bank making a loan and in addition, in legal effect, guaranteed the payment of the amount of his stockholding liability to the bank. In this transaction he paid nothing to the Tunnel Company. He merely changed the form of his obligation for the debts of that corporation. It is difficult to see on what theory he is entitled to deduct as a loss this shift in the form of his liability where his books were kept on a cash basis. Later, the taxpayer substituted for his guaranty of his pro rata of the Tunnel Company's note for $188,166.44 his own note payable directly to the same bank for that pro rata amount $29,472. Subsequently a renewal note was made covering his entire indebtedness to the bank. It is true that if the taxpayer had borrowed $29,-

---

[2] "In computing net income there shall be allowed as deductions: * * *

"(e) Losses by Individuals. In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise— * * *

"(2) if incurred in any transaction entered into for profit, though not connected with the trade or business."

162

472 and paid his proportion of the Tunnel Company's note for $188,166.44, or had paid his note for $29,472 later executed, he would be entitled to treat this payment as a loss and deduct the same from his cash income for the year 1929 (Crain v. Com'r, supra); but until such a loan is made or the money is otherwise paid, the transaction merely amounts to a shifting of the form of the obligation and no deduction was permissible to one keeping books on a cash basis. Eckert v. Burnet, 283 U.S. 140, 51 S.Ct. 373, 75 L.Ed. 911.

The item of $2,763 claimed by the taxpayer as a deductible loss was paid in cash by the taxpayer for the Tunnel Company on November 30, 1929, on account of his guarantee of the note for $188,166.44. This represented part of his loss of cash under the syndicate agreement and he was entitled to deduct it from the gross income in 1929.

The other item claimed by the taxpayer as a deduction is one-half of $2,799.84 ($1,399.92) acknowledged by the Tunnel Company as paid in cash to it by the taxpayer. The taxpayer testified with reference thereto as follows:

"The payment of $1,399.92 on July 5, 1929, to which I have testified was a payment made on my behalf. I cannot give the details concerning the payment, and I do not know whether it was paid by the Mission Land & Cattle Company or myself personally. * * *

"Q. I want to clear up about this cash payment. Now, the first payment was $1,-399.92, and that was either cash out of your own pocket which you paid, or cash from the Mission Land & Cattle Company, which they paid on your behalf, but that was really a cash transaction? A. I believe it was. I am indefinite in my recollection, but I believe that we received a letter from the California Bridge & Tunnel Company asking us for the payment, and we made that payment. That was the payment of the $1,399.92."

■ The record before us would justify the conclusion that this amount was paid by the taxpayer on the obligations of the syndicate, but the question is one of fact which we leave for the determination of the Board of Tax Appeals in accordance with law as determined herein.

The decision of the Board of Tax Appeals is reversed, with instructions to fix the tax of the petitioner in accordance

herewith, allowing a deduction for a loss of $93,358.74, plus $2,763, plus such other sum in cash as the Board of Tax Appeals may determine he is entitled to deduct by reason of the payment of $2,799.84 above referred to, of which the taxpayer claims a deduction of $1,399.84.

HANEY, Circuit Judge, dissenting.

I dissent. The taxpayer made his return on the cash basis. The amount claimed as a deduction was paid in 1929 by the taxpayer from proceeds of his note to a bank made in 1929, but which note was not paid in 1929. Under such circumstances, the taxpayer sustains a loss only when he pays the note. Eckert v. Burnet, 283 U.S. 140, 51 S.Ct. 373, 75 L.Ed. 911; Hart v. Commissioner (C.C.A.1) 54 F.(2d) 848, 852. The taxpayer in the taxable year parted with nothing but a promise to pay; he merely substituted creditors. Crain v. Commissioner (C.C.A.8) 75 F.(2d) 962, is contrary, but I am unwilling to follow it.

Assuming the soundness of the majority's holding with respect to the theory of a primary liability imposed by the law of California, in favor of the bank, and against the petitioner, it is difficult to see how the bank can be a third party or stranger to the transaction as argued by petitioner as being the factor distinguishing this from Eckert v. Burnet, supra.