**Frank R. S. KAPLAN, Beatrice B. Bramer, Cecil B. Mihaly and George C. Brown, Executors, Estate of S. Eugene Bramer, Deceased,**

v.

**The UNITED STATES of America.**
**Civ. A. No. 11193.**

United States District Court
W. D. Pennsylvania.
July 30, 1957.

Samuel Kaufman, Pittsburgh, Pa., for plaintiffs.

D. Malcolm Anderson, U. S. Atty., Thomas J. Shannon, Asst. U. S. Atty., Pittsburgh, Pa., James P. Garland and Robert L. Toomey, Dept. of Justice, Washington, D. C., for United States.

GOURLEY, Chief Judge.

This is an action for refund of income taxes in the amount of $70,000 for the year 1943, alleged to have been erroneously collected from plaintiffs' decedent.

The following questions are raised:

1. Whether a taxpayer reporting on the cash basis, who borrows money from a third person to pay his creditor a deductible debt, must take his deduction in the year the creditor was paid or in later years when the third party is paid.

2. Whether the doctrine of collateral estoppel precludes a judgment for taxpayers on their second cause of action by reason of judgment by the Tax Court and its affirmation by the United States Court of Appeals for the Third Circuit.

3. Whether a taxpayer reporting on the cash basis, who purchases stock on margin, pledging as collateral the purchased stock and stock of an associate, sustains a deductible loss in the year the collateral is sold and his indebtedness to the creditor is extinguished, or in later years when he partially reimburses the associate whose collateral was sold.

For purposes of brevity, the following abbreviations are employed:

| | |
|---|---|
| S. Eugene Bramer | —Bramer—Decedent |
| Hornblower & Weeks | —Hornblower |
| William K. Frank | —Frank |
| Copperweld Steel Co. | —Copperweld |
| National Steel Corp. | —National |
| Lee B. Foster | —Foster |
| Rustless Iron Corporation | —Rustless |
| Bank of Pittsburgh | —Bank |
| Weirton Steel Co. | —Weirton |

There are two substantive issues of tax law raised in this action, each being set up in the complaint as a separate cause of action. For the sake of clarity, the facts necessary to a determination of each issue are presented separately.

The facts are undisputed and have been stipulated between counsel for the parties.

### First Cause of Action

Prior to May 13, 1931, Bramer, now deceased and hereinafter referred to as Decedent, maintained a large margin account with the stock brokerage firm of Hornblower. This account was partially secured by 2,000 shares of Copperweld which Decedent had borrowed from Frank. Subsequently, Hornblower re-

quired additional collateral, and accordingly Decedent borrowed from Frank 2,000 shares of the stock of National and posted them as collateral with Hornblower in place of the Copperweld stock.

On or about May 13, 1931, Hornblower served notice that it intended to close out the Decedent's account which, of course, meant selling the collateral, including the 2,000 shares of National which the decedent had borrowed from Frank. Rather than lose those shares, Frank paid to Hornblower $84,000, the then market value of the 2,000 shares, and reclaimed them. On the same day, the Decedent gave Frank a note in the amount of $84,000. At the same time Hornblower sold out Decedent's account at a heavy loss.

In 1942 and 1943 Decedent paid to Frank the respective amounts of $21,250 and $35,036.12 on account of the principal of his May 13, 1931 note. These amounts were deducted as losses on Decedent's returns for the year in question. In determining the income tax liability of Decedent for the year 1943, the amounts paid in 1942 and 1943 on the principal of said note must be considered and evaluated. The Commissioner disallowed the deductions, claiming that Decedent's loss was sustained and, therefore, deductible when the brokerage account was liquidated, to-wit 1931, rather than when the payments were made on the principal of Decedent's note to Frank. The propriety of the Commissioner's determination is challenged in the taxpayers' first cause of action.

In summary, what occurred was that Decedent owed Hornblower a large sum of money, which was partially collateralized by stock borrowed from Frank in the value of $84,000. When Hornblower gave notice that it intended to close out Decedent's account, Frank, rather than lose the stock which he had loaned to Decedent, paid to Hornblower $84,000 and reclaimed his shares of stock. Hornblower applied the $84,000 in partial discharge of Decedent's debt and closed out his account at a heavy loss. On the same day, Decedent gave to Frank his note

in the amount of $84,000. In reality, therefore, what took place was a borrowing of $84,000 from Frank by Decedent and use of the $84,000 in partial liquidation of a deductible debt. The question, therefore, is whether Decedent was required to claim his deduction at the time of the payment of the $84,000 to Hornblower or whether he may postpone claiming his deduction until he repays the loan from Frank.

Upon a most detailed review of the authorities, I am convinced that. if the taxpayer himself actually paid in cash his part of the loss at the time Hornblower applied the collateralized stock in partial discharge of his debt, it would hardly be contended that he could not, in that year, have charged the sum paid as a proper deduction from his income for that year. I cannot accept the thesis that circumstances have changed merely because he was forced to borrow from another in order to make his payment. Crain v. Commissioner, 8 Cir., 75 F.2d 962; McAdams v. Commissioner, 15 T.C. 231, affirmed, 5 Cir., 198 F.2d 54.

Expenses paid with borrowed funds are deductible by a taxpayer on the cash basis in the year in which they are actually paid, and the deduction thereof cannot be deferred until a later year when repayment of the borrowed funds is made by the taxpayer. Jarvis v. Heimer, 3 Cir., 39 F.2d 361; Jenkins v. Bitgood, 2 Cir., 101 F.2d 17; Humphrey v. Commissioner, 9 Cir., 91 F.2d 155.

I must conclude, therefore, that Decedent should have taken his deduction in the year when the creditor was paid rather than in the year when the loan was repaid.

### Second Cause of Action

On September 24, 1929, Decedent, Foster and Frank entered into a syndicate agreement for the purchase of 60,000 shares of Rustless. Foster and Frank were to finance the syndicate by negotiating a loan from the Bank. The cost of the shares amounted to $236,752.50. The note to the Bank was signed by

the three participants. Payment of the loan was secured by the hypothecation of the 60,000 shares of Rustless owned by the syndicate and also by 236 and 250 shares of Weirton stock owned respectively by Frank and Foster. Weirton was subsequently reorganized as National.

The syndicate agreement provided in part as follows:

> The Bramer, Foster, Frank Syndicate is composed of Messrs. S. E. Bramer, Lee B. Foster, and Wm. K. Frank. Each member is to receive one-third of the net profits from the sale of the International Rustless stock, or one-third of all such stock remaining at the termination of the syndicate after all debts have been paid and the above mentioned Weirton Steel, or any other borrowed securities, returned to its (sic) respective owners. It is also agreed that any losses sustained by the syndicate shall be borne equally.

> It is further agreed that this syndicate may be terminated, or any of the stock sold, upon the written direction of any two members.

By July 14, 1930, payment of the syndicate's debt was secured by 2,000 and 1,161 shares of National owned respectively by Frank and Foster, and 38,151 shares of Rustless owned by the syndicate. The reduction in the number of Rustless shares was brought about between January 1, 1930 and July 14, 1930, when the Bank sold 21,849 of the syndicate's Rustless shares for $45,209.55, which was applied against the syndicate's indebtedness. Decedent, on his individual income tax return for 1930, claimed a loss of $13,667.41, being one-third the excess of the average cost of said 21,849 shares of Rustless over the sales price.

On January 14, 1931, $199,942.93 was owed to the Bank. Foster and Frank settled two-thirds of the syndicate's obligation to the Bank, leaving $66,647.64 unpaid. On the last mentioned date the

Decedent gave the Bank his promissory note in that sum. Pursuant to arrangements made with the Bank by Frank, the Bank continued to hold as collateral on Decedent's note the 2,000 shares of National stock previously deposited by Frank as collateral on the joint note and 12,717 shares, one-third the balance of 38,151 shares, of Rustless remaining in the hands of the Bank after the sales in 1930 of 21,849 shares out of the original 60,000 shares.

As of January 14, 1931, the Bank held two other notes of Decedent aggregating $17,993.11. These two notes and the note for $66,647.64 provided that the property deposited as collateral security for payment of each note was also security for "any other liability or liabilities of the undersigned to the holder hereof, now due or to become due, or that may be hereafter contracted."

From October 3, 1932 to August 1, 1935 all dividends from the collateraled 2,000 National shares were credited by the Bank to the principal indebtedness represented by the two smaller notes of Decedent, except for $112.50 which was applied to the interest on the note of January 14, 1931. Beginning on May 22, 1935, the Bank began to foreclose the National shares so posted and apply the proceeds to the January 14, 1931 note. By July 29, 1935, 1,880 shares were sold by the Bank and $66,595.59 credited to the principal debt, leaving an unpaid balance of $52.05. That balance was paid off on August 5, 1935 by the sale of Rustless shares. Thus, by August 1, 1935, funds amounting to $101,051.11 coming either from sales of Frank's National stock or from dividends thereon were applied by the Bank in satisfaction of Decedent's indebtedness to it.

Prior to August 1, 1935, Frank, whose collateral had largely been used in paying off the debt to the Bank, transferred all of his claims against Decedent to W. K. Frank, Inc. Decedent gave to such corporation his promissory note dated August 1, 1935, in the amount of $100,-839.17, to cover the dividends from and

proceeds of sales of Frank's collateral applied by the Bank on the Decedent's notes, less a small amount deducted by an adjustment not here material.

On December 1, 1938, W. K. Frank, Inc. assigned to the W. K. Frank Trust of 1931 the note executed to it by Decedent on August 1, 1935.

Decedent made aggregate cash payments of $121,693.89 to the W. K. Frank Trust of 1931 on account of the principal and interest of his note as follows:

| Date | Principal | Interest | Total |
|---|---|---|---|
| 12/20/39 | | $13,293.97 | $ 13,293.97 |
| 4/ 8/40 | $ 10,000.00 | | 10,000.00 |
| 12/31/40 | | 2,937.13 | 2,937.13 |
| 12/23/41 | 13,492.70 | 2,672.20 | 16,164.90 |
| 7/ 7/42 | 21,250.00 | | 21,250.00 |
| 9/15/42 | 6,270.20 | 1,345.20 | 7,615.40 |
| 2/ 8/43 | 49,826.27 | 606.22 | 50,432.49 |
| | $100,839.17 | $20,854.72 | $121,693.89 |

In 1941 Decedent claimed as a deduction on his individual income tax return the amount of $13,492.70, representing the payment made during that year on the principal of his August 1, 1935 note. The Commissioner disallowed that deduction, claiming that on his 1930 return Decedent had correctly claimed his pro rata share of the loss sustained by the syndicate from the sale by the Bank of 21,849 shares of Rustless stock on July 14, 1930, and that in 1935 he sustained one-third of the syndicate's loss from the sale in that year of the balance of the Rustless stock held by the Bank as collateral on the syndicate's original note, and that he was not entitled to deduct any part of the 1941 payment on the principal of his note to W. K. Frank, Inc.

Decedent filed a petition for redetermination with the Tax Court which, on May 9, 1946, sustained the position of the Commissioner. 6 T.C. 1027. The Tax Court's decision was affirmed by the United States Court of Appeals for the Third Circuit, Bramer v. Commissioner, 161 F.2d 185. Petition for rehearing was denied by the Court of Appeals for the Third Circuit on July 5, 1947. Petition for writ of certiorari was denied by the Supreme Court of the United States. Bramer v. Commissioner, 332 U.S. 771, 68 S.Ct. 85, 92 L.Ed. 356.

The question on the merits raised by the second cause of action is, ultimately, whether Decedent sustained his loss on the syndicate's stock transaction in 1930 and 1935 when his shares of Rustless stock were sold by the Bank or in the years when payments were made on the principal of his note to W. K. Frank, Inc. The vehicle utilized for presentation of this issue is an action for refund of taxes for the year 1943 which challenges the Commissioner's disallowance as a deduction in 1942 and 1943 of payments on the principal of the note in those two years. In the case of Bramer v. Commissioner, supra, Decedent presented the same issue by a petition in the Tax Court attacking the Commissioner's disallowance as a deduction in 1941 of that year's payment on the principal of the note. The issue was decided adversely to Decedent in the Tax Court. The Tax Court's judgment was affirmed by the Court of Appeals for the Third Circuit. A petition for rehearing was denied by that court on July 5, 1947 and certiorari was denied by the Supreme Court.

In Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898, the Supreme Court discussed at some length the principles of res judicata as they apply to tax litigation.

The Court held that the doctrine of collateral estoppel applies where:

1. The second case involves the same parties as the first, or their privies;

2. The second case involves the same facts and issues presented and determined in the first case; and

3. The controlling legal principles are the same.

1. *Identity of parties.* The parties to this action are clearly in privity with the parties to the Tax Court proceeding. In that case the petitioner was the taxpayer himself, Samuel Eugene Bramer. The respondent was the Commissioner of Internal Revenue. In this case, Mr. Bramer having died in 1949, the plaintiffs are his personal representatives, the executors of his estate, who are obviously in privity with the Commissioner or any other officer acting officially on its behalf. Tait v. Western Maryland Ry. Co., 289 U.S. 620, 53 S.Ct. 706, 77 L.Ed. 1405.

2. *Identity of facts and issues.* That the controlling facts and issues in this case are identical with those in the Tax Court proceeding is also self-evident. The deductibility of the payments on the principal of the note in 1942 and 1943, as in 1941, depends upon the answer to the question whether the loss on the syndicate's stock transaction occurred for tax purposes in 1930 and 1935. This identity of facts and issues is dramatized by the fact that the evidence upon which the court is asked to answer the substantive issue is simply the record of the Tax Court proceeding.

3. *Identity of law.* The governing provisions of the Internal Revenue Code of 1939 upon which the Tax Court case was decided were Sections 23(e) and 43, 26 U.S.C.A. (I.R.C.1939) §§ 23(e), 43. Those same provisions control disposition of the merits of this case.

I am satisfied that the judgment in the earlier litigation operates as an estoppel to a judgment for the taxpayers on their second cause of action in this case.

The sole question posed in connection with the Rustless stock is whether Decedent sustained a deductible loss in 1942 and 1943 when he made partial payments on his note to W. K. Frank, Inc., dated August 1, 1935.

As I have stated before, it matters not that the property paid out is a loan from a third party. The loss is deductible when there has been such an outlay, and not when the lending creditor is repaid. Jarvis v. Heimer, supra; Crain v. Commissioner, supra; Humphrey v. Commissioner, supra.

I see no difference between the circumstances herein existing than when A borrows from B to buy from C. If the property bought from C is sold at a loss, A's loss must be deducted then, and not when he repays B.

I must, therefore, conclude that the Commissioner correctly disallowed the deduction forming the taxpayers' first cause of action. As to the second cause of action, a decision in favor of the taxpayers is precluded by the doctrine of collateral estoppel, and that the Commissioner correctly disallowed the deductions in the years in which they were claimed.

Judgment will be entered in favor of the United States of America.

### Findings of Fact

1. Plaintiffs are the executors under the will of S. Eugene Bramer (hereinafter referred to as Bramer) who died on March 24, 1949 and who at the time of his death was a citizen of Pennsylvania.

2. After Bramer filed his income and victory tax returns for the calendar years 1942 and 1943, the Commissioner of Internal Revenue determined a deficiency for the taxable year ended December 31, 1943 in the amount of $82,138.17, and on September 9, 1948 Bramer paid the deficiency, together with interest thereon, to Stanley Granger, Collector of Internal Revenue, who at the time of filing the complaint in this action was not in office.

3. On or about August 15, 1950, the plaintiffs filed with the Collector of Internal Revenue a claim for refund of $82,000 of income and victory tax for the taxable year ended December 31, 1943, and on February 19, 1951 the Commissioner of Internal Revenue mailed to the

plaintiffs a notice of disallowance of the claim in full.

### First Cause of Action

4. Between the summer of 1929 and May 31, 1931 Bramer maintained a large margin account with the stock brokerage firm of Hornblower & Weeks.

5. To protect his margin account, Bramer posted with Hornblower & Weeks, as additional collateral, 2,000 shares of the common stock of the Copperweld Steel Company which he had borrowed from William K. Frank (hereinafter referred to as Frank).

6. Later, the market for Copperweld Steel stock being unsatisfactory, Hornblower & Weeks required additional margin. Accordingly, Bramer borrowed from Frank 2,000 shares of the common stock of National Steel Corporation (hereinafter referred to as National Steel) and posted it as additional collateral with Hornblower & Weeks. This was in substitution for the 2,000 shares of Copperweld Steel stock theretofore posted.

7. On or about May 13, 1931, Hornblower & Weeks gave notice that it intended to close out Bramer's account and sell the 2,000 shares of National Steel stock which Bramer had borrowed from Frank and which he had posted as additional margin. The 2,000 shares of National Steel stock then had a market value of $84,000. Rather than lose the stock, Frank reclaimed it by paying $84,000 to Hornblower & Weeks. On that same date, Bramer gave Frank his note in the amount of $84,000. Hornblower & Weeks then sold out the remaining securities in Bramer's margin account at a heavy loss.

8. In 1942 and 1943 Bramer paid to Frank the respective amounts of $21,250 and $35,036 on account of the principal of his May 31, 1931 note to Frank. On his tax returns for those years Bramer claimed those payments as deductions from gross income. In determining the deficiency described in paragraph 2 of these findings, the Commissioner of Internal Revenue disallowed the claimed deductions of these payments to Frank.

### Second Cause of Action

9. On October 1, 1929 Bramer entered into a written agreement with Lee B. Foster and William K. Frank whereby a syndicate, composed of the three signers, was formed "to operate in the purchase and sale of International Rustless Iron Corporation stock" (hereinafter referred to as Rustless).

10. The syndicate agreement provided in pertinent part as follows:

At a special meeting called Monday, September 23, 1929, a Syndicate was formed to be known as the Bramer, Foster, Frank Syndicate, Lee B. Foster, Trustee, and W. T. Davidson, Secretary, to operate in the purchase and sale of International Rustless Iron Corporation stock.

It was agreed that Messrs. Lee B. Foster and William K. Frank were to finance the Syndicate by negotiating a loan through The Bank of Pittsburgh, N.A., secured by the following:

236 shares Weirton Steel Company owned by Wm. K. Frank

250 Shares Weirton Steel Company owned by Lee B. Foster

The Bramer, Foster, Frank Syndicate is composed of Messrs. S. E. Bramer, Lee B. Foster, and Wm. K. Frank. Each member is to receive one-third of the net profits from the sale of the International Rustless stock, or one-third of all such stock remaining at the termination of the Syndicate after all debts have been paid and the above mentioned Weirton Steel, or any other borrowed securities, returned to its respective owners. It is also agreed that any losses sustained by the Syndicate shall be borne equally.

It is further agreed that this Syndicate may be terminated, or any of the stock sold, upon the written direction of any two members.

Along the lines of the above agreement, the following purchases of International Rustless Iron Corporation stock have been made:

\*    \*    \*    \*    \*    \*

[60,000 shares, total cost $236,-752.50.]

All shares of the International Rustless Iron are to be paid for as delivered, and when delivery is completed the Syndicate will contain 60,000 shares at a total cost of $236,-752.50.   \*    \*    \*

11.    Foster and Frank negotiated a loan in the amount of $236,752.50 from The Bank of Pittsburgh, N.A. (hereinafter referred to as the Bank) to finance the syndicate purchase of 60,000 shares of Rustless stock.   One note, signed by Bramer, Frank and Foster, was given to the Bank to evidence the loan and all 60,-000 shares of Rustless were held by the Bank as collateral on the loan.

William K. Frank
Lee B. Foster
S. E. Bramer
Bramer, Foster, Frank
    Syndicate

15.    By January 14, 1931 the syndicate owed the Bank $199,942.93 by reason of the transactions described in paragraphs 9 through 14 of these findings. On that date Frank and Foster each settled with the Bank for his one-third of the syndicate obligation and Bramer gave his personal note to the Bank for $66,647.64, which represented his one-third of the balance due on the syndicate note.  As collateral on this note the Bank retained 12,717 shares of Rustless stock (being Bramer's one-third of the 38,151 shares held by the Bank after the 1930 sales) and also the 2,000 shares of National Steel which belonged to Frank and which are referred to in Paragraph 14 of these findings.

16.    As of January 14, 1931 the Bank held two other notes from Bramer on which the unpaid balances were $2,077.17

12.    In addition to the 60,000 shares of Rustless stock the Bank held as collateral on the syndicate loan, 236 shares of Weirton Steel Company stock owned by Frank and 250 shares of the stock of that company owned by Foster.

13.    Between January 1, 1930 and July 14, 1930 the Bank sold 21,849 of the 60,000 shares of Rustless stock held by it as collateral of the syndicate note for $45,209.55 and applied the proceeds on the loan.  On his 1930 income tax return Bramer claimed a loss on this transaction of $13,667.41, being one-third of the excess of the average cost of 21,849 shares over the sales price.

14.    Between September 23, 1929 and July 14, 1930 Weirton Steel Company was reorganized into National Steel Corporation.   Frank deposited additional collateral on the syndicate note so that by July 14, 1930 the collateral deposited with the Bank as security for the unpaid balance of the syndicate note of $236,-752.50 was as follows:

2,000 shares National Steel
1,161 shares National Steel
Nothing

38,151 shares Rustless

and $15,915.94, respectively.   Each of Bramer's notes contained a provision that property deposited as security for each note was also security for "any other liability or liabilities of [Bramer] to the holder hereof, now due or to become due, or that may be hereafter contracted."

17.    From October 3, 1932 to August 1, 1935, all dividends from Frank's 2,000 shares of National Steel stock posted as collateral for Bramer's note of January 14, 1931 were credited by the Bank to the principal of the indebtedness represented by Bramer's two small notes, with the exception of $112.50, which was applied to the interest on his note of January 14, 1931.

18.    Beginning on May 22, 1935 the Bank began to foreclose Frank's National Steel shares posted as collateral

for Bramer's obligations and to apply the proceeds to the principal and interest of Bramer's note of January 14, 1931. Eighteen hundred shares had been sold by July 29, 1935, and of the proceeds, $66,595.59 was applied to the principal of the January 14, 1931 note, leaving an unpaid principal balance of $52.05.

19. On August 5, 1935, the Bank sold Bramer's Rustless shares for $816.67 and applied $598.73 of the proceeds to final liquidation of his January 14, 1931 note ($52.05 to principal and $546.68 to interest). The balance of $217.94 was paid in cash to William K. Frank, Inc., which had previously become the owner by transfer by William K. Frank of his interest in the 2,000 shares of National Steel stock mentioned in paragraphs 14, 15, 17 and 18 of these findings.

20. The remaining amounts due on Bramer's two smaller notes to the Bank were paid from the proceeds of sales by the Bank of and dividends from the securities mentioned in those notes.

21. By August 1, 1935 funds amounting to $101,051.11, coming either from sales of Frank's National Steel stock or from dividends thereon, were applied in satisfaction of Bramer's indebtedness to the Bank, and following the final credits mentioned in paragraphs 19 and 20 of these findings, Bramer's obligations to the Bank were completely paid.

22. On August 1, 1935 Bramer gave to William K. Frank, Inc., his promissory note in the amount of $100,839.17, arrived at as follows:

| | |
|---|---:|
| Amounts mentioned in finding No. 21 | $101,051.11 |
| Plus: Difference on records of W. K. Frank | 6.00 |
| | $101,057.11 |
| Less: Cash payment mentioned in Finding No. 19 | 217.94 |
| | $100,839.17 |

23. On December 1, 1938, W. K. Frank, Inc., assigned to the W. K. Frank Trust of 1931 Bramer's note of August 1, 1935.

24. Bramer claimed no deduction on his 1935 income tax return on account of the sales of his Rustless stock in 1935,

but upon audit thereof a loss of $86,203.33, limited to $2,000, was allowed.

25. Bramer made aggregate cash payments of $121,693.89 to W. K. Frank Trust of 1931 on account of his note of August 1, 1935 as follows:

| Date | Principal | Interest | Total |
|---|---:|---:|---:|
| 12/20/39 | | $13,293.97 | $ 13,293.97 |
| 4/ 8/40 | $ 10,000.00 | | 10,000.00 |
| 12/31/40 | | 2,937.13 | 2,937.13 |
| 12/23/41 | 13,492.70 | 2,672.20 | 16,164.90 |
| 7/ 7/42 | 21,250.00 | | 21,250.00 |
| 9/15/42 | 6,270.20 | 1,345.20 | 7,615.40 |
| 2/ 8/43 | 49,826.27 | 606.22 | 50,432.49 |
| | $100,839.17 | $20,854.72 | $121,693.89 |

26. On his income tax return for 1941 Bramer claimed as a deduction the payment made in 1941 on the principal of his August 1, 1935 note to W. K. Frank, Inc. The deduction was disallowed, as a result of which Bramer filed a petition in

the Tax Court of the United States for redetermination of his 1941 income tax liability.

27. On May 9, 1946 the Tax Court sustained the Commissioner's disallowance of Bramer's deduction of his 1941 payment on account of the principal of his August 1, 1935 note. 6 T.C. 1027. The United States Court of Appeals for the Third Circuit affirmed, and later denied a rehearing. 161 F.2d 185. The Supreme Court denied Bramer's petition for a writ of certiorari. 332 U.S. 771, 68 S.Ct. 85, 92 L.Ed. 356.

28. The opinion of the United States Court of Appeals for the Third Circuit read in its entirety as follows:

"The decision of the Tax Court must be affirmed. See 6 T.C. 1027. Our conclusion is based upon Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248, and the later similar decisions of the Supreme Court."

29. On his income tax returns for 1942 and 1943 Bramer again claimed as deductions payments made on the principal of his August 1, 1935 note to W. K. Frank, Inc., i. e., the payments made in 1942 and 1943. The Commissioner again disallowed these payments as a deduction and assessed a deficiency in taxes, which Bramer has paid.

30. The facts giving rise to the Tax Court proceedings and those upon which the Second Cause of Action in this case are based are identical.

31. Bramer always made his federal income tax returns on the basis of cash receipts and disbursements.

## Conclusions of Law

### First Cause of Action

1. Bramer sustained a deductible loss under Section 23(e) (2) of the Internal Revenue Code of 1939 on May 13, 1931.

2. The payment of $84,000 made by Frank to Hornblower & Weeks on May 13, 1931 was in legal contemplation a loan of that amount to Bramer and a use of the borrowed funds by Bramer partially to satisfy a deductible obligation

to Hornblower & Weeks. Accordingly, the deduction should have been taken by Bramer in 1931 rather than in later years when he repaid Frank.

3. The Commissioner correctly disallowed as deductions in 1942 and 1943 payments made by Bramer to Frank on account of the principal of his May 13, 1931 note.

### Second Cause of Action

4. The parties to this action are in privity with the parties to the Tax Court case of Bramer v. Commissioner, 6 T.C. 1027, affirmed 3 Cir., 161 F.2d 185, certiorari denied 332 U.S. 771, 68 S.Ct. 85, 92 L.Ed. 356. The facts and issues involved in the Second Cause of Action are the same as in the Tax Court case. It follows that the judgment of the Tax Court operates as an estoppel to the entry of judgment for the plaintiffs on their Second Cause of Action.

An appropriate Order is entered.