SANTA ANITA CONSOLIDATED, INC. (FORMERLY LOS ANGELES TURF CLUB, INC.), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3577–65. Filed July 2, 1968.

*Maynard J. Toll, Bennett W. Priest,* and *Stanton H. Zarrow,* for the petitioner.

*Myron A. Weiss* and *Allan Teplinsky,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioner's Federal corporate income tax as follows:

| TYE Oct. 31— | Amount |
| --- | --- |
| 1956 | $700,575.38 |
| 1958 | 207.99 |
| 1959 | 1,586,790.02 |

Certain issues have been conceded by the parties. The questions remaining for decision are: (1) Whether petitioner is entitled to a deduction for a loss in the year 1959 resulting from its payment of $4,396,000 in connection with the transfer of its interest in Pacific Ocean Park, Inc., to Pacific Seaboard Land Co. and, if so, whether the loss is an ordinary loss or a capital loss; (2) whether petitioner sustained a loss in the year 1959 on the transfer of its stock in Pacific Ocean Park, Inc., to Pacific Seaboard Land Co. in the amount of $900,000, or in any amount.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and exhibits thereto are incorporated herein by this reference.

Petitioner Santa Anita Consolidated, Inc. (formerly known as the Los Angeles Turf Club, Inc. and hereinafter referred to as petitioner or LATC), is a California corporation with its principal place of business at Santa Anita Park, Arcadia, Calif. The tax returns of petitioner for the periods here involved were filed with the district director of internal revenue at Los Angeles, Calif.

For some time prior to 1956, LATC had been interested in developing an entertainment activity in the nature of a family-type amusement park in Southern California. In 1956, LATC assigned two of

its employees, Jaynes and O'Dorisio, the task of searching for a location for such an entertainment enterprise.

The result of the investigation by Jaynes and O'Dorisio was a report entitled "Proposed Ocean Park Amusement Center (Revised: 12–10–56)," which they presented to the officers and board of directors of LATC. The proposed park was to be located on the Santa Monica Beach, at the site of an existing park at the juncture of the cities of Los Angeles and Santa Monica. The report concluded that an amusement center could be constructed for a total of $3 million, and would have an annual attendance of 2,250,000 people. On the basis of this report LATC decided to proceed with such a project.

Jaynes and O'Dorisio discussed the project with Columbia Broadcasting System, Inc. (hereinafter referred to as CBS), which manifested an interest in proceeding with the proposed amusement park.

On January 23, 1957, LATC and CBS entered into a preincorporation subscription agreement providing for the organization of a corporation to be known as Pacific Ocean Park, Inc. (hereinafter referred to as POP), and the purchase by each of 4,000 shares of POP's $100 par value capital stock for $400,000. On the same date, LATC and CBS entered into an agreement concerning POP which stated in part:

At such time or times as Park may desire to borrow funds from any bank or banks or other financing institutions, Club shall guarantee any such loan or loans up to an aggregate amount of $1,125,000 and CBS shall guarantee such loan or loans up to an aggregate amount of $1,075,000; provided that Club shall not be obligated to guarantee any such loan or loans in an aggregate amount exceeding by more than $50,000 the aggregate amount theretofore and/or concurrently therewith guaranteed by CBS; and provided further that CBS shall not be obligated to guarantee any loan or loans unless an aggregate amount at least $50,000 more than the aggregate amount guaranteed by CBS has been and/or is concurrently guaranteed by Club. * * *

On January 26, 1957, POP was incorporated for the purpose of developing and operating a family-type amusement park.

On June 3, 1957, a document entitled "Master Plan of Pacific Ocean Park Amusement Center" was submitted and considered by the board of directors of POP and the management of LATC. The master plan confirmed the estimate that the cost of creating an amusement center would be $3 million. Based on an estimated annual attendance at the park of 2,250,000 people; income of $2,700,000; expenses, excluding depreciation and taxes, of $1,400,000; depreciation for income tax purposes of $500,000; California corporation tax of $32,000; and Federal income tax of $394,000, the master plan projected an estimated average annual net profit of $370,000. The master plan envisioned that the park would open to the public on or about June 30, 1958, and operate on an annual basis.

On July 18, 1957, POP and the Bank of America National Trust & Savings Association (hereinafter referred to as Bank of America or bank) entered into an agreement whereby the bank agreed to loan to POP a principal amount up to but not in excess of $2,200,000. This agreement provided that the loan would bear interest at the rate of 4½ percent per annum and be evidenced by promissory notes, and that the bank would be entitled to a commitment fee at the rate of ½ of 1 percent. Interest was payable quarterly, and the principal sum was repayable as follows:

| | |
|---|---|
| Oct. 1, 1958 | $300,000 |
| Oct. 1, 1959 | 600,000 |
| Oct. 1, 1960 | 650,000 |
| Oct. 1, 1961 | Balance |

The aforementioned agreement of July 18, 1957, further provided that POP would furnish to the bank separate continuing guaranties of CBS and LATC, and that it would deliver, or cause to be delivered, balance sheets and profit and loss statements of CBS, LATC, and POP within 90 days of the close of each fiscal year the loan was outstanding.

In accordance with the agreement entered into by LATC and CBS on January 23, 1957, LATC and CBS, on October 3, 1957, entered into a continuing guaranty agreement with Bank of America under which the shareholders severally agreed to be liable as guarantors of POP's indebtedness to Bank of America in an amount not to exceed $2,200,000. Although the continuing guaranty was not signed until October 3, 1957, it was a part of the original loan transaction entered into on July 18, 1957. The continuing guaranty provided that:

Guarantors waive any right to require Bank to (a) proceed against Borrower; (b) proceed against or exhaust any security held from Borrower; or (c) pursue any other remedy in Bank's power whatsoever. Guarantors waive any defense arising by reason of any defense of Borrower or by reason of the cessation from any cause whatsoever of the liability of Borrower. Until all indebtedness of Borrower to Bank shall have been paid in full, even though such indebtedness is in excess of Guarantors' liability hereunder, Guarantors shall have no right of subrogation, and waive any right to enforce any remedy which Bank now has or may hereafter have against Borrower, and waive any benefit of, and any right to participate in any security now or hereafter held by Bank. Guarantors waive all presentments, demands for performance, notices of non-performance, protests, notices of protest, notices of dishonor, and notices of acceptance of this guaranty and of the existence, creation, or incurring of new or additional indebtedess.

In addition to all liens upon, and rights of setoff against the moneys, securities or other property of Guarantors given to Bank by law, Bank shall have a lien upon and right of setoff against all moneys, securities and other property of Guarantors now or hereafter in the possession of or on deposit with Bank,

whether held in a general or special account or deposit, or for safekeeping or otherwise; and every such lien and right of setoff may be exercised without demand upon or notice to Guarantors. * * *

LATC and CBS also agreed to "unconditionally guarantee and promise to pay" to the bank "on demand, whether due or not due," all indebtedness of POP. The guarantors also agreed to subordinate any present or future indebtedness of POP to them to the indebtedness of POP to the bank.

During the spring of 1958, it became apparent that the amount estimated in the master plan for the creation of the amusement park was too low. Due to the fact that the project grew considerably in scope, and the fact that the opening had to be postponed more than 1 month, additional funds were needed. Because of the need for additional funds, there was submitted to the board of directors of POP at its meeting held on March 18, 1958, a "Request for Additional Funds" which set forth POP's cash requirements to open the park to the public on July 1, 1958. These funds were in addition to the $3 million contemplated by the master plan and an additional $300,000 approved by the parties.[1] This request showed that POP would need an additional $1,293,000, primarily due to the expanded concept of the park, and to the need to replace certain piles, decking, and sections of buildings on the amusement pier prior to opening rather than during the operation of the park. In addition, the request envisioned the establishment of a $400,000 revolving fund for lessees' improvements to be constructed by POP. The request concluded that "The enlarged concept of the Park in size, capacity, decoration and show-wise has made possible the participation of national advertisers [i.e., Westinghouse Electric Corp., Coca-Cola Bottling Co., Union Oil of California, Foremost Dairies, and the Bank of America] * * * and most certainly enhances the Park potential in enticing greater numbers of patrons to come to the Park. Due to these changes, it is reasonable to forecast an additional 250,000 paid admissions per year which would make the estimated annual attendance 2,500,000."

The request for additional funds was discussed by the board at that time, but a decision was postponed until a subsequent meeting. Following the board of directors meeting of March 18, 1958, an additional meeting was held on March 27, 1958, to discuss further the corporate cash needs. At that time POP requested the Del E. Webb Construction Co. to make an analysis of the future costs. On April 14,

---

[1] Although it is apparent that the $300,000 addition to the guaranty was approved separately from the subsequent approval of additional funds, the actual addition to the line of credit was handled together with the new request in the "First Amendment of Loan Agreement" dated Apr. 15, 1958.

1958, Del E. Webb Construction Co., by letter, advised that, in addition to the funds previously requested, a further $213,000 would be necessary to complete the entire project in line with the plans, specifications, and commitments already made.

On April 14, 1958, POP's board of directors authorized it to increase the amount of its indebtedness to Bank of America from $2,200,000 to $4,200,000 for the purposes outlined in the request of March 18. In accordance with this authorization, POP and Bank of America entered into the "First Amendment of Loan Agreement" on April 15, 1958, increasing the amount the bank was willing to lend POP to $4,200,000. Interest on the first $2,500,000 was payable quarterly at the rate of 4½ percent per annum, and interest on the balance was payable quarterly at the rate of 4 percent per annum. The principal sum of $4,200,000 was repayable as follows:

| | |
|---|---|
| Oct. 1, 1958 | $300,000 |
| Oct. 1, 1959 | 975,000 |
| Oct. 1, 1960 | 975,000 |
| Oct. 1, 1961 | 975,000 |
| Oct. 1, 1962 | Balance |

On May 20, 1958, the shareholders of POP amended their continuing guaranty agreement with Bank of America to reflect the increased amount of POP's indebtedness.

The amount projected as necessary to complete the project by July 1, 1958, in the letter from Del E. Webb Construction Co. proved to be inadequate. The need for additional funds was due to the incurring of a considerable amount of overtime labor costs in order to complete the project, additional costs in building facilities for rides for certain concessionaires, and the lost revenues resulting from the failure to open the park until July 22, rather than July 1, and then only on an incomplete basis. The additional costs were also partly attributable to insistence by the cities of Santa Monica and Los Angeles on certain structural changes in order to conform the pier to the applicable municipal codes. In order to meet partially the financial needs of POP, LATC and CBS each contributed $250,000 to POP's capital on July 8, 1958. In addition, POP increased its line of credit with Bank of America to $5,800,000 on July 31, 1958, which increase was guaranteed by LATC and CBS. The $5,800,000, with interest quarterly at the rate of 4 percent per annum, was repayable as follows:

| | |
|---|---|
| Oct. 1, 1958 | $300,000 |
| Oct. 1, 1959 | 1,135,000 |
| Oct. 1, 1960 | 1,235,000 |
| Oct. 1, 1961 | 1,235,000 |
| Oct. 1, 1962 | 1,095,000 |
| Oct. 1, 1963 | Balance |

Pacific Ocean Park was opened on July 22, 1958. Attendance at the park during the period of July 22, 1958, through August 31, 1958, was 683,642. The attendance during the summer of 1958 was greater than had been anticipated in the master plan.

In order to help meet the additional costs of POP necessitated by the changed concept and further major problems, LATC and CBS each contributed $250,000 to POP's capital on August 23, 1958. In addition, on September 15, 1958, POP secured from Bank of America an increase in its line of credit with the result that POP was able to borrow a maximum of $7,300,000. The $7,300,000, with interest payable quarterly at the rate of 4 percent per annum, was repayable as follows:

| | | | |
|---|---|---|---|
| Oct. 1, 1958 | $300,000 | Oct. 1, 1962 | $1,095,000 |
| Oct. 1, 1959 | 1,135,000 | Oct. 1, 1963 | 1,000,000 |
| Oct. 1, 1960 | 1,235,000 | Oct. 1, 1964 | 1,000,000 |
| Oct. 1, 1961 | 1,235,000 | Oct. 1, 1965 | Balance |

LATC and CBS modified their continuing guaranty agreement with Bank of America to guarantee this larger amount.

During the late fall of 1958 POP's management decided to close the park shortly after the first of the year and reopen in May 1959, even though this would result in loss of income for those months. This decision was based on the fact that attendance during the winter months was lagging, which was attributable to the coldness of the nights along the Pacific Ocean. As a result of the decision to close the park, additional funds were needed to carry it through the winter months and to get it ready for the reopening on May 1, 1959. Consequently, on November 20, 1958, POP increased its line of credit with Bank of America to a maximum of $8,750,000, which increase was again guaranteed by LATC and CBS. The increased borrowing was evidenced by a promissory note for $1,750,000, bearing interest at the rate of 4½ percent per annum, payable quarterly. Of this amount, $300,000 apparently was used to make the first repayment on the outstanding debt, resulting in the net line of credit of $8,750,000. This principal amount was repayable as follows:

| | | | |
|---|---|---|---|
| Oct. 1, 1959 | $1,135,000 | Oct. 1, 1963 | $1,000,000 |
| Oct. 1, 1960 | 1,235,000 | Oct. 1, 1964 | 1,000,000 |
| Oct. 1, 1961 | 1,235,000 | Oct. 1, 1965 | [1]1,050,000 |
| Oct. 1, 1962 | 1,095,000 | Oct. 1, 1966 | 1,000,000 |

[1] The $1,050,000 payment due Oct. 1, 1965, represents the balance due on the original promissory note of $7,300,000, plus the first repayment on the $1,750,000 note of $750,000.

On April 10, 1959, POP and the bank modified the repayment provisions of the $7,300,000 promissory note by a "Third Amendment of Loan Agreement." The amended agreement provided for principal

repayment on the balance due as follows (including the payments in 1965 and 1966 on the $1,750,000 note).

| | | | |
|---|---|---|---|
| Oct. 1, 1959 | [1] $750,000 | Oct. 1, 1963 | $1,000,000 |
| Oct. 1, 1960 | 750,000 | Oct. 1, 1964 | 1,000,000 |
| Oct. 1, 1961 | 750,000 | Oct. 1, 1965 | 1,000,000 |
| Oct. 1, 1962 | 1,000,000 | Oct. 1, 1966 | 2,500,000 |

[1] On Sept. 30, 1959, this payment was postponed to Jan. 2, 1960.

In addition, POP agreed to pay within 90 days after the close of each calendar year, except for 1963 and 1964, "an amount equal to the amount by which the aggregate of 100 % of depreciation plus 100% of net earnings after taxes of [POP] exceeds the required principal payment" due during that year, provided, however, that in no event was the additional payment to exceed the following:

| | | | |
|---|---|---|---|
| 1959 | $385,000 | 1963 | 0 |
| 1960 | 485,000 | 1964 | 0 |
| 1961 | 485,000 | 1965 | $50,000 |
| 1962 | 95,000 | | |

The following is a schedule of the capital contributions to and guaranteed indebtedness of POP from January 23, 1957, to October 23, 1959:

| Date | Capital | Guaranteed debt |
|---|---|---|
| 1/23/57 to 7/17/57 | $800,000 | |
| 7/18/57 to 4/14/58 | 800,000 | $2,200,000 |
| 4/15/58 to 7/7/58 | 800,000 | 4,200,000 |
| 7/8/58 to 7/30/58 | 1,300,000 | 4,200,000 |
| 7/31/58 to 8/22/58 | 1,300,000 | 5,800,000 |
| 8/23/58 to 9/14/58 | 1,800,000 | 5,800,000 |
| 9/15/58 to 11/19/58 | 1,800,000 | 7,300,000 |
| 11/20/58 to 10/23/59 | 1,800,000 | 8,750,000 |

Each loan made to POP by the bank was recommended by the bank's finance committee. In each case the finance committee's memorandum contained detailed information concerning the financial position of POP, LATC, and CBS, including average deposit balances and balance sheets in summary form.

The moneys borrowed by POP from Bank of America were used in the construction of the park and, in addition, were used to meet operating costs.

During November 1958, the staff at POP prepared a schedule showing the "1959 Projected Operating Statement" and the "Cash Flow Projection, 1959 for POP." These projections, on which LATC relied, showed that POP would, for 1959, have a net loss of only $2,328 and would have sufficient cash to pay the installment of the debt due Bank of America in September 1959.

Pacific Ocean Park reopened on May 1, 1959, and during the period May 1, 1959, through September 30, 1959, the attendance was 771,924, substantially less than the 1958 level and the master plan projections. This disappointing attendance, at first attributed to the bad weather, became a matter of grave concern to LATC and CBS during July 1959. Because of the disappointing attendance during the early part of the summer of 1959, POP commissioned Marco Engineering to prepare a report on the public reaction to POP. This report, entitled "Public Reaction to Pacific Ocean Park," was submitted in September 1959 and indicated that POP's annual attendance could not be expected to be greater than 1 million unless major revisions in the park were undertaken. Management of LATC believed that in order for POP to break even an attendance level of 1,750,000 was necessary.

In addition to the pessimistic attendance projection, LATC was also advised (by POP) that POP's cash requirements during the winter of 1959 were $2,300,000.

The apparent inability of POP to reach a profitable level in the foreseeable future and POP's continued cash needs led to some fear on the part of LATC that its own operations might eventually be affected by the needs of POP. In light of these facts, the decision was reached by LATC and CBS to dispose of POP.

POP had entered into numerous contracts with lessees and concessionaires, many of whom were brought into the project directly by LATC and CBS. These contracts were still outstanding and were to expire at various times in the future. Management of both LATC and CBS were advised by counsel that if POP were liquidated POP would incur additional liabilities to the lessees and concessionaires, not reflected on POP's balance sheets, in the neighborhood of $4 million, to $6 million, depending upon when POP was liquidated. These commitments of POP were also considered to be business obligations of LATC and CBS and to affect their business reputation and integrity. Not only did the fulfillment of these contractual obligations to the lessees and the concessionaires constitute one of the objectives of LATC and CBS in determining the manner in which they would terminate their interest in POP, but also such fulfillment would, in the view of LATC and CBS, prevent POP from incurring substantial additional liabilities.

Four alternative methods of terminating LATC's and CBS' interest in POP were considered. These were: (1) Bankruptcy; (2) a transfer of the POP stock to a corporation newly formed by the lessees and concessionaires; (3) the transfer of LATC's stock interest in POP to CBS; and, finally, (4) a transfer of all of POP's outstanding stock to a third party.

The possibility of liquidating POP in bankruptcy was discarded for a number of reasons. First, both LATC and CBS feared that such a course of action would have an adverse effect on their reputation in the business community. In addition, this course of action would not have fulfilled one of the basic objectives, namely, ensuring that POP's contractual obligations to its lessees and concessionaires were met. Moreover, management of LATC and CBS believed that the assets of POP, usable in the main only for an amusement park, had no net salvage value. In fact, LATC and CBS believed that POP had a negative salvage value.

The possibility of transferring POP to a new corporation formed by the lessees and the concessionaires was discarded because of lack of interest on the part of the lessees and concessionaires.

The possibility of LATC transferring its stock interest in POP to CBS was never discussed in more than a preliminary manner. It was considered as a possibility only if no third-party purchaser could be found who would satisfy the basic objectives of LATC and CBS.

LATC and CBS recognized, in the light of the 1959 operating experience and the Marco Engineering report, that they would be required to pay an amount of cash to any purchaser in order to accomplish their business objectives. However, LATC and CBS were interested in paying the least possible amount of money in order to accomplish these objectives. In this connection, whenever negotiations with a prospective purchaser reached the point where the amount that LATC and CBS would pay to secure the release of liability as guarantors was discussed, an amount considerably less than $8,750,000 was proposed.

LATC recognized that if it negotiated with Bank of America with the view to terminating its contingent obligation to the bank, it would be required to pay its full share of POP's indebtedness, and that it still would be left with the problem of disposal of the corporation with all its operating problems and potential liabilities.

Strenuous efforts were made by the management of LATC and CBS to discover a potential purchaser who would secure for them their release of liability as guarantors and, in addition, continue the operation of the park. In addition to numerous people with whom the project was discussed in general terms, LATC, for its part, contacted National Theaters, the Murchisons (of Dallas, Tex.), and John M. Morehart. On October 7, 1959, LATC wrote John H. Mullins, representative of the Murchison interests, offering to pay $6,950,000 in cash (minus certain sums) and to transfer the stock of POP in return for release of liability as guarantors. For its part, CBS, primarily through Edmund Pugh, vice president, Finance, discussed disposal

of the POP venture with William Zeckendorf, a representative of Harvard Industries, Glen Alden Corp., David Baird, a Wall Street financier, Henry Harris of Harris Upham & Co., Tex McCrary, and a representative of International Recreation Corp.

None of the people contacted by LATC or CBS, except John M. Morehart, made an offer to acquire POP. On October 9, 1959, LATC offered, on behalf of itself and CBS, to transfer to Morehart the stock of POP together with cash in the amount of $6,950,000 in return for a release of LATC and CBS as guarantors of POP's indebtedness. Morehart's business background and family connections were investigated by LATC and CBS and they were convinced that Morehart was a responsible member of the community whose word could be accepted. Morehart assured LATC and CBS of his intention to continue operations of the park.

Following the letter of October 9, 1959, additional negotiations were conducted with Morehart. It became apparent that Morehart was unwilling to acquire POP and deliver the release of liability as guarantors to LATC and CBS unless the shareholders paid $8,750,000. LATC and CBS were unable to discover any other purchaser interested in acquiring POP and since no other potential purchaser appeared on the horizon, LATC and CBS accepted the terms demanded by Morehart. Subsequently, Morehart demanded an additional $42,000 which represented the amount of interest accrued and unpaid on POP's debt to Bank of America and the amount of compensation due to the president of POP on the remaining term of his employment contract. The transaction was consummated in accordance with the terms negotiated.

On or about October 23, 1959, the following transactions took place:

(1) LATC and CBS each paid $4,375,000 to Pacific Seaboard Land Co. (hereinafter referred to as Pacific), a corporation wholly owned by Morehart, and $21,000 to Morehart. In addition, LATC and CBS transferred to Pacific all the issued and outstanding stock of POP.

(2) Pacific paid the Bank of America $5 million, reducing POP's outstanding indebtedness to the bank to $3,750,000, delivered to the bank U.S. Tax Exemption Certificates due June 22, 1960, in the face amount of $3,750,000, bearing interest at the rate of 4.53 percent per annum, and delivered to LATC and CBS a release of their liability as guarantors.

(3) Bank of America assigned to Pacific two notes of POP in the amounts of $750,000, due October 1, 1965, and $1 million due October 1, 1966, and marked promissory notes totaling $3,250,000 as paid; reduced the interest due on the balance owing on the POP indebtedness to 4 percent per annum, and executed a release of the liability of peti-

tioner and CBS as guarantors. The release provided, in part, as follows:

WHEREAS, BANK * * * has made an arrangement with a person or persons, other than Guarantors or either of them, whereby BANK * * * has agreed to release the said Guarantors, and each of them, of and from any and all liability to BANK * * * arising out of or by reason of or based upon or connected with said Continuing Guaranty:

Now, THEREFORE, for valuable consideration, receipt of which is hereby acknowledged, BANK * * * hereby releases and forever discharges * * * [LATC and CBS], and each of them * * * of and from any and all liability * * * based upon or connected with said Continuing Guaranty. * * *

(4) POP delivered to Pacific a promissory note for $3,250,000, and prepaid the interest due on the remaining balance of the line of credit to June 22, 1960, in the amount of $99,863.01.

LATC had no ownership or other connection whatsoever with Morehart or Pacific other than a prior discussion of an unrelated business transaction.

Prior to the transaction with Pacific and Morehart, LATC and CBS loaned directly to POP $140,000 each, which was used by POP to meet its payroll obligations. LATC and CBS were motivated in making this loan by their desire to prevent POP from having a payroll lien filed against it which might force it into bankruptcy while they were trying to arrange for a sale to a third party. As part of the closing transaction with Pacific and Morehart, POP executed new notes in favor of LATC and CBS in the amount of $140,000 each, replacing the original notes. The execution of the new notes was insisted upon by Morehart since he wanted an additional 4 years to pay off this amount. As of the trial date POP had paid LATC only a portion of this indebtedness.

On its Federal corporate income tax return for taxable year ending October 31, 1959, LATC deducted $4,396,000 as an ordinary loss, and $900,000 as a long-term capital loss, resulting in a net operating loss of $1,396,689.45. Petitioner applied for a tentative carryback adjustment in this amount for 1956. In his notice of deficiency, respondent disallowed the claimed deductions and denied the loss carryback.

ULTIMATE FACTS

During 1957 and 1958, LATC and CBS each invested $900,000 in the capital stock of POP. In these same years the Bank of America made loans to POP in the total amount of $8,750,000 and LATC guaranteed the repayment of one-half of such loans together with interest thereon.

During 1957 and 1958, LATC did not intend to nor in fact did it borrow any funds from the Bank of America in connection with POP. During 1959, LATC did not intend to make and in fact made no payments to the Bank of America in connection with POP.

LATC did not intend to and in fact did not make a capital contribution to POP as a result of its guaranteeing a portion of POP's indebtedness to the Bank of America.

LATC did not intend to and in fact did not make a capital contribution to POP as a result of its payment of $4,396,000 to Pacific and Morehart.

LATC's payment of $4,396,000 to Pacific and Morehart was a payment made to secure a release of liability as guarantor and is deductible from ordinary income.

On October 23, 1959, LATC transferred its POP stock to Pacific. The transfer was motivated by a desire to protect its business reputation which could have been injured by the closing of POP. LATC had a basis of $900,000 in the stock, and suffered a capital loss in that amount.

#### OPINION

In 1956, petitioner (LATC) conceived the idea of constructing an amusement park in Southern California and solicited the entry of Columbia Broadcasting System, Inc. (CBS) into a joint venture to construct and operate the park. To this end they organized Pacific Ocean Park, Inc. (POP), each subscribing to $400,000 worth of stock and agreeing to guarantee a line of credit from the Bank of America to POP.

Petitioner estimated that POP could be constructed for $3 million and that its investment would begin to pay off almost immediately as a "second Disneyland." As detailed in our findings, the initial estimate was too low, and more and more money—in the form of additional capital and guaranteed debt—was required. When POP opened in 1958, it met with initial success beyond that estimated by the master plan. But, after a disastrous second season, and a gloomy report by a market research firm, it finally became clear that POP had fizzled.

If the saga of POP ended here it would only serve to illustrate a gigantic business mistake. But petitioner's financial disaster has been magnified by respondent's refusal to allow any deduction whatever for the $4,396,000 paid in connection with petitioner's guaranty of bank loans to POP or for the $900,000 petitioner invested in POP's stock. There is no denial that petitioner laid out these sums, or that its connection with POP was completely severed in 1959. However, respondent, advancing a long series of arguments, contends that all of

petitioner's stake in POP, including the guaranty of indebtedness to the bank, was equity investment, and that petitioner is not entitled to any deduction whatever in 1959. [2]

Petitioner maintains that it is entitled to deduct the $4,396,000 as a "loss * * * not compensated for by insurance or otherwise" under Code section 165(a), [3] and the $900,000 invested in the POP stock as a long-term capital loss. We agree with petitioner. The $4,396,000 payment to Pacific for release from the guaranty was irretrievably lost in a transaction closed in 1959. Petitioner had no right to compensation for its loss by insurance, subrogation or otherwise. The loss thus meets the requirements of section 165(a). We reject respondent's efforts to subject the loss to capital loss limitations on the theory that petitioner was in substance the borrower and made a $4,396,000 capital contribution when the loans were made by the bank or when the guaranty was released. Petitioner, being a corporation, is not subject to the non-business bad debt limitations of section 166(d) or any possible implied disallowance under the provisions for deductions by guarantors (other than corporations) of certain noncorporate obligations in section 166(f).

Respondent's first contention is that the loans purportedly made to POP were in fact loans made to petitioner and CBS, and that petitioner and CBS then contributed these funds to POP's capital. He bases his contention on both the "form" and the "substance" of the transactions.

The papers involved in the purported guaranty agreements show that the primary debtor was POP, and that petitioner and CBS were guarantors of the obligation. However, respondent contends that the obligation under the continuing guaranty was so broadly stated as to make petitioner and CBS the primary obligors. The continuing guaranty provides that petitioner and CBS agree to "unconditionally guarantee and promise to pay" to the bank "on demand" all indebtedness of POP "whether due or not due." In addition, the guarantors waived any right to require the bank to pursue any remedy against POP, or to assert any defense which POP could have asserted. Furthermore, petitioner and CBS granted a lien and a right of setoff to the bank against any property of the guarantors in its possession. All presentments, demands, and notices were also waived by the guarantors.

---

[2] At no point in the briefs does respondent say when or in what circumstances petitioner would be entitled to a deduction for any part of its outlay of either the $4,396,000 disbursed in obtaining a release from the guaranty or the $900,000 invested in POP's stock. The main thrust of the argument is that both sums were capital contributions to POP and that petitioner's entire capital interest was disposed of to acquire goodwill which, apparently, should be treated as a nondeductible capital expense.

[3] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

While the list of rights ceded by the guarantors seems impressive at first glance, a closer study of the general law of guaranty and the particular law of California discloses that the continuing guaranty was not extraordinary.

Prior to the adoption of the Uniform Commercial Code in 1963,[4] the California statutes on guaranty obligations were contained in sections 2787–2854 of the California Civil Code. As of 1939, California abandoned the distinction between surety and guaranty, and, in assessing respondent's arguments as to the form of petitioner's guaranty, it is important that the principles of suretyship apply equally to a guaranty in the years here in question. Cal. Civ. Code sec. 2787.

Under California law as it stood in the pertinent period, the obligation of a guarantor is presumed to be unconditional. *Id.* sec. 2806. The guarantor is liable on default of the principal obligor, without notice or demand. *Id.* sec. 2807; *Bloom* v. *Bender*, 48 Cal. 2d 793, 313 P. 2d 568 (1957). Even when the statute of limitations bars an action against the principal debtor, the guarantor may nevertheless be liable, *Bloom* v. *Bender*, *supra*, and the guarantor may not rely on the personal defenses of the principal debtor, Cal. Civ. Code sec. 2810, discharge of the principal debtor in bankruptcy, *Bloom* v. *Bender*, *supra*, or an independent cause of action which the principal debtor may have against the creditor as a defense or offset. *Stockton Savings & Loan Society* v. *Giddings*, 96 Cal. 84, 30 Pac. 1016 (1892). Mere delay in proceeding against the principal does not exonerate the guarantor, Cal. Civ. Code sec. 2823; *Katz* v. *Haskell*, 196 Cal. App. 2d 144, 16 Cal. Rptr. 453 (Dist. Ct. App. 1961), and the guarantor's liability is not predicated upon the creditor's exhaustion of his remedies against the principal debtor. *American Guaranty Corp.* v. *Stoody*, 230 Cal. App. 2d 390, 41 Cal. Rptr. 69 (Dist. Ct. App. 1964); *Bank of America Nat. Trust & Saving Ass'n.* v. *McRae*, 81 Cal. App. 2d 1, 183 P. 2d 385 (Dist. Ct. App. 1947). Furthermore, section 3054 of the California Civil Code gives a bank a general lien on all property in its hands belonging to a customer, and this includes the property of a guarantor. *Melander* v. *Western Nat. Bank*, 21 Cal. App. 462, 132 Pac. 265 (1913). Thus, it appears that many, if not all, of the provisions in the continuing guaranty agreement are provided for under California law, and that the remaining terms of the agreement are consonant

---

[4] Uniform Commercial Code sec. 3–416 (Cal. Comm. Code sec. 3416) provides that the contract of a guarantor of payment means that the guarantor will pay the instrument "when due * * * without resort by the holder to any other party." In addition, "when words of guaranty are used presentment, notice of dishonor and protest are not necessary to charge the user."

with general commercial practice.[5] Accordingly, we find that the terms of the guaranty were not so broad that we should treat petitioner as a principal obligor.

Respondent's stronger argument is addressed to the "substance" of the transaction. He argues that the loans should be treated as if petitioner and CBS borrowed the funds from the bank and then contributed them to the corporation as capital.

We agree with respondent that the fact that the advances were made in the form of guaranteed debt does not, in and of itself, negate their treatment as capital contributions. Whether such debt is to be treated as an indirect capital contribution must be resolved by an investigation of the facts in the light of traditional debt-equity principles. Each case, including a case involving guaranteed debt, turns on its own facts, and we do not read *Murphy Logging Co.* v. *United States*, 378 F. 2d 222 (C.A. 9, 1967), relied upon by petitioner, to establish a contrary rule.

A variety of criteria has been advanced as helpful in determining whether, on the particular facts of a case, advances should be characterized as debt or equity. See, e.g., *O. H. Kruse Grain & Milling Co.* v. *Commissioner*, 279 F. 2d 123 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court; *John Town, Inc.*, 46 T.C. 107, 127 (1966), affirmed per curiam —— F. 2d —— (C.A. 7, 1967), and cases cited therein. With these criteria in mind, and after careful consideration of the evidence in this case, we have found as an ultimate fact that the loans by the bank of America to POP, guaranteed by petitioner and CBS, were valid loans and not contributions to the capital of POP.

The loan instruments evidence an unconditional obligation to pay fixed sums on fixed maturity dates. The debts bear a fixed rate of interest payable unconditionally, are unsubordinated, and carry no voting rights at any time. The bank's records show that the loans were made to POP and include extensive financial data on POP's operations. The loans were at all times shown on the books and financial statements of POP as debts. "While form is certainly not controlling, it is relevant and entitled to some weight." *Charles E. Curry*, 43 T.C. 667, 687 (1965).

Respondent notes, however, that there was no provision as to minimum working capital or net worth on the part of POP, or any security for the debt. The absence of these items has been adequately explained. Petitioner's treasurer at the time of these transactions, David B. Mac-Tavish, testified that the amusement park business was essentially

---

[5] For a guaranty agreement in California similar in language to the agreement between the Bank of America, petitioner and CBS, see *United States Leasing Corp.* v. *duPont*, —— Cal. App. 2d ——, 64 Cal. Rptr. 120, 126 fn. 3 (Dist. Ct. App. 1967). At least one treatise contains a similar form of guaranty agreement. See Denonn, Secured Transactions 173–176 (P. L. I., rev. ed. 1965). See generally 10 Williston, Contracts ch. 38 (3d ed. Jaeger 1967).

a cash business, with little or no inventory. Cash requirements, beyond a small amount necessary to make change at the ticket windows, etc., were basically nil. Similarly, the business was of such a character that a great deal of security was not available. Much of the amusement park was constructed on leased land, leaving a minimum amount of fee land available for mortgaging. Much of the land was possibly owned by the City of Santa Monica, due to the tidal flow, and there had never been an adjudication as to the property line. In addition, the amusement park assets were of relatively little value except as features of an operating amusement park. Indeed, it was these factors which necessitated a guaranty arrangement.[6]

Turning to the circumstances surrounding the loans, we note that the funds advanced by the bank were used by POP to construct assets necessary to its operation and to meet operating costs. From the outset of the venture it was planned that a substantial portion of the funds essential to the corporate venture would come from borrowings. These factors are relevant in determining whether the loans are to be regarded as debt or equity. See *Isidor Dobkin*, 15 T.C. 31 (1950), affirmed per curiam 192 F. 2d 392 (C.A. 2, 1951) ; *Sam Schnitzer*, 13 T.C. 43 (1949), affirmed per curiam 183 F. 2d 70 (C.A. 9, 1950), certiorari denied 340 U.S. 911 (1951). Yet these factors must be weighed against the basic rule that, unless the debt is a mere sham or subterfuge, taxpayers are not foreclosed from financing a transaction in a manner to provide a minimum exposure of their assets to the risk of the venture. See, e.g., *Byerlite Corporation* v. *Williams*, 286 F. 2d 285 (C.A. 6, 1960) ; *George A. Nye*, 50 T.C. 203 (1968). Moreover, this is quite clearly not a case of "thin" capitalization. From its inception POP had paid-in capital of $800,000 and additional sums were subsequently invested by both petitioner and CBS. By late summer 1958 petitioner and CBS had concededly contributed a total of $1,800,000. See *John Kelley Co.* v. *Commissioner*, 326 U.S. 521, 526 (1946), where it is suggested that the thin capitalization test has value only in "extreme situations such as nominal stock investments and an obviously excessive debt structure."

Respondent argues strongly that it was unreasonable to expect that the loans could be enforced according to their terms; i.e., that they would be collectible from POP regardless of the success of the venture. However, the Jaynes and O'Dorisio survey completed in

---

[6] One aspect of the transaction has been left unexplained. All written agreements between petitioner and CBS and the bank indicate that petitioner was obligated to pay over 50 percent of the guaranty and that CBS was obligated to pay less than 50 percent. Unless there were separate memoranda to the contrary, this would seem to delineate the obligations. However, when payments were made to Pacific to assume the obligation, petitioner and CBS contributed equally. A number of possible conflicting inferences arise. Hence, we do not rely on this factor in determining the true nature of the transactions for Federal tax purposes.

December 1956, the master plan of June 1957, the 1958 attendance which was even greater than that envisioned in the master plan, the "1959 Projected Operating Statement" and "Cash Flow Projection, 1959 for POP" all indicated that POP would be able to pay the notes. It was in reliance on these figures that petitioner made each of the loan guaranties. It was not until after the disastrous summer of 1959 when the attendance was only 771,924, compared with 1,750,000 thought necessary to break even, and after the receipt in September 1959 of the Marco Engineering report entitled "Public Reaction to Pacific Ocean Park" that it became apparent that the park could not succeed without substantial, costly modifications. Petitioner guaranteed no loans thereafter. Significantly, the optimism of LATC and CBS prior to the end of the summer of 1959 was shared by numerous concessionaires and advertisers, including Coca-Cola, Westinghouse, and United States Rubber Co., which made large commitments for facilities within the park.

While there was an element of risk involved we do not believe this is determinative. Any unsecured debt involves some risk. "For the advance to be a loan, it is not necessary that there be an unqualified expectation of repayment." *Richard M. Drachman*, 23 T.C. 558, 562 (1954). As was noted in *American Processing & Sales Co.* v. *United States*, 371 F. 2d 842, 856–857 (Ct. Cl. 1967): "In the final analysis all loans to a company depend for their repayment on the success of the borrower, and this is, of course, equally true of salvaging equity investments. * * * The real differences lie in the debt-creating intention of the parties, and the genuineness of repayment prospects in the light of economic realities." See also *Earle* v. *W. J. Jones & Son*, 200 F. 2d 846, 851 (C.A. 9, 1952); *Jack Daniel Distillery* v. *United States*, 379 F. 2d 569 (Ct. Cl. 1967); *Royalty Service Corporation* v. *United States*, 178 F. Supp. 216 (D. Mont. 1959).

Some of the advances were made when POP had a substantial deficit position.[7] Respondent argues that it is inconceivable that anyone would

---

[7] The amount of POP's annual deficits is difficult to determine. A number of financial statements were admitted into evidence, and the figures vary widely. For example, the Federal corporate income tax returns indicate the following deficits:

| | |
|---|---|
| Dec. 31, 1957 | $3, 778. 96 |
| Dec. 31, 1958 | 535, 859. 92 |
| Sept. 30, 1959 | 1, 882, 362. 23 |

At the same time, the corporate records indicate the following deficits:

| | |
|---|---|
| Dec. 31, 1957 | $216, 713 |
| Dec. 31, 1958 | 1, 700, 760 |
| Sept. 30, 1959 | 3, 091, 920 |

A memorandum of the Bank of America finance committee dated Sept. 14, 1959, indicates POP's deficit as of Dec. 31, 1958, as $1,701,000.

advance funds during this period with a genuine expectation of repayment. We disagree. Petitioner's witnesses testified, and we believe, that they expected initial debt payments to come from cash flow rather than profits and that eventually the park would produce large net income. While cash flow depends on gross revenue it does not necessarily depend upon profits. Rather, the funds may come from income sheltered by the depreciation deductible for tax purposes. Indeed, this is precisely what occurred, for POP made all interest payments on the loans even though it continually functioned at a deficit. Not until the end of the summer of 1959 did it appear that long-term success was not in prospect. We do not think petitioner and CBS would have continued to obligate themselves as guarantors for additional loans if they had not expected the park to succeed. Indeed, they made no further advances after receiving reports of the poor attendance in the summer of 1959 and the adverse Marco Engineering report.

We think it reasonable to conclude, as respondent contends, that an unrelated party would not have made unsecured loans to POP in the amounts here involved. But the courts have repeatedly said that this factor alone does not preclude a finding of a bona fide indebtedness. See *Jack Daniel Distillery* v. *United States, supra; American Processing & Sales Co.* v. *United States, supra* at 852; *Gooch Lumber Sales Co.*, 49 T.C. 649 (1968). Moreover, this criterion is not entirely apposite in a guaranty situation. The guaranty is simply one form of security. A bank may request a guaranty in addition to, or in preference over, another form of security particularly when it can obtain guarantors of the caliber of petitioner and CBS. Cf. *Murphy Logging Co.* v. *United States, supra; Los Angeles Shipbuilding & Drydock Corp.* v. *United States*, 166 F. Supp. 914 (S.D. Cal. 1958), affd. 289 F. 2d 222 (C.A. 9, 1961). While it would be dangerous to assume that simply because advances take the form of guaranteed debt they are immune from reclassification as equity, it is equally dangerous to assume that because of guaranty form is chosen (or insisted upon by the lender) the advances must be risk capital. To do so comes close to causing the guarantor to be "penalized * * * for responsibility." *Murphy Logging Co.* v. *United States, supra* at 224. See also *State Bank of Albany* v. *United States*, 276 F. Supp. 744 (N.D.N.Y. 1967), affirmed per

---

A "Statement of Source and Use of Funds" prepared by Lybrand, Ross Bros. & Montgomery indicates cumulative net operating losses as follows:

| | |
|---|---|
| Dec. 31, 1957 | $480, 448 |
| Dec. 31, 1958 | 1, 653, 480 |
| Sept. 30, 1959 | 3, 091, 921 |

The variations in these figures appear to be attributable mainly to differences in the classification of certain outlays as current expenses or capital expenditures.

curiam 389 F. 2d 85 (C.A. 2, 1968). As a practical matter, since POP's assets were usable for virtually no purpose other than an amusement park, the only security which would protect the Bank was a guaranty.

From the record it appears that the business was one in which it was expected that large outlays would be required at the start, but relatively little or no additional funds would be needed once the park was opened. At the outset this is what occurred. POP opened on July 22, 1958. For the 6-week period ending August 31, 1958, its corporate records indicate an excess of income over expenses of $171,-417.22. Additional funds were needed for a number of reasons detailed in our findings but none of those reasons cast doubt on the ultimate success of the enterprise. Up until the time that the attendance figures for the summer of 1959 and the Marco Engineering market survey indicated that POP would not draw as predicted, we believe that petitioner reasonably expected that it would not be called to make good its guaranty. Petitioner and CBS were not the only optimistic parties; we have noted that a number of important concessionaires also indulged in the belief that the park would succeed.

For the purposes of this determination, we must attempt to place ourselves in the position of petitioner at the time the advances were made. Hindsight is a particularly inappropriate tool in this instance. If the venture had succeeded, and the loans had been paid, we doubt that respondent could succeed with this argument. He can do no better now, for the view must be the same.

Respondent argues in the alternative that if the loans were valid when made, and petitioner was simply a guarantor (as we have found), then petitioner made a capital contribution to POP when it paid $4,396,000 and "released POP from its debt."

It is well recognized that where a shareholder gratuitously forgives a corporate debt owed to him the transaction may be considered a capital contribution. See, e.g., *Helvering* v. *Amer. Dental Co.*, 318 U.S. 322 (1943). It is apparent, however, from the cases cited by respondent that the shareholder must have some presently enforceable right against the corporation (even though the right may be worthless) which he relinquishes in order for the rule to apply. Thus, in *Lidgerwood Mfg. Co.* v. *Commissioner*, 229 F. 2d 241 (C.A. 2, 1956), affirming 22 T.C. 1152 (1954), certiorari denied 351 U.S. 951 (1956) ; *Ransom E. Olds*, 18 B.T.A. 1215 (1930), reversed on stipulation 59 F. 2d 1070 (C.A. 6, 1931) ; and *Liggett's Estate* v. *Commissioner*, 216 F. 2d 548 (C.A. 10, 1954), affirming a Memorandum Opinion of this Court, the corporate debt had arisen out of direct lendings by the shareholder. Even though the debt was assumed to be uncollectible, the shareholder was a creditor and could have sued on his claim. Similarly, in *Bratton*

v. *Commissioner*, 217 F. 2d 486 (C.A. 6, 1954), the shareholder had guaranteed corporate debt, and had paid the primary creditor. Upon payment of the debt he stepped into the shoes of the primary creditor through subrogation. Cf. *Putnam* v. *Commissioner*, 352 U.S. 82 (1956). Thus, *after payment under the guaranty*, he had a cause of action which he relinquished. On the other hand, where a guarantor has not paid under his guaranty but has been released, no right of subrogation exists and there is no claim to forgive. See *Eugene H. Rietzke*, 40 T.C. 443 (1963); *J. J. Shea*, 36 T.C. 577 (1961), affirmed per curiam 327 F. 2d 1002 (C.A. 5, 1964).

We are convinced from the record as a whole that petitioner did not intend to make a capital contribution to POP when it paid $4,396,-000 to Pacific on October 23, 1959; to the contrary, petitioner and CBS dealt directly and exclusively with Pacific, not POP, in handling this transaction. As a matter of law, we are equally convinced that petitioner had no claim against POP to forgive by reason of the payment. Respondent urges that such a claim existed because petitioner and CBS actually paid the bank in full, using Pacific as a conduit. To uphold respondent's argument we must reach two conclusions: (1) The bank received full payment on October 23, 1959,[8] and (2) Pacific was simply a conduit for such payment. After careful consideration of the entire record we are unable to reach *either* of these conclusions.

The major problem with the first leg of respondent's argument is that, as of October 23, 1959, no one was subrogated to the bank's claim because the debt was not paid in full.[9] In this connection the continuing guaranty agreement, dated October 3, 1957, expressly provided:

Until all indebtedness of Borrower to Bank shall have been paid in full even though such indebtedness is in excess of Guarantors' liability hereunder, Guarantors shall have no right of subrogation, and waive any right to enforce any remedy which Bank now has or may hereafter have against Borrower, and waive any benefit of, and any right to participate in any security now or hereafter held by Bank.

By no stretch can it be said that these provisions were part of an elaborate facade created to avoid tax. They were obviously designed to protect the bank and were inserted in the agreements before any

---

[8] On opening brief respondent appears to contend that the checks from petitioner and CBS were actually made payable to the bank rather than to Pacific. On the basis of *W. A. Shaw*, 27 T.C. 561 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958), and similar cases, he argues that since the checks were not produced at trial we should assume that they would support his theory. Unlike *Shaw*, however, there is more than a "scintilla" of evidence to the contrary—namely the testimony of David B. MacTavish, treasurer of petitioner, that the check was written to Pacific. Respondent did not attempt to impeach this testimony at trial, or object to its admissibility, or question it in any way.

[9] In fact, as noted in our findings, only a small portion of the debt was due on that date. The balance became due under the loan agreements over a 7-year period.

loans were made and before any losses were anticipated. Indeed, they follow closely the common law principles of subrogation in guaranty situations described in *Eugene H. Reitzke, supra* at 451–452, as follows:

It may also be stated as a general rule that a person is not entitled to be subrogated to the rights of a creditor until the claim of the creditor against the debtor has been paid in full. *American Surety Co.* v. *Electric Co.*, 296 U.S. 133. * * * The rationale of this rule protects the creditor so that he may obtain full satisfaction of the debt. If the guarantor who made a partial payment were subrogated *pro tanto* he would hold a position of equality with the holder of the debt for which the guarantor is bound, and the loss may then fall equally upon the creditor and the guarantor. Accordingly, a guarantor liable only for part of a debt does not become subrogated to remedies available to a creditor unless he pays the whole debt or it is otherwise satisfied. See *United States* v. *National Surety Co.*, 254 U.S. 73.

See also *Employers Mut. Liab. Ins. Co. of Wis.* v. *Pacific Ind. Co.*, 167 Cal. App. 2d 369, 334 P. 2d 658 (Dist. Ct. App. 1959) ; Cal. Civ. Code sec. 2867.

The bank was not paid in full on October 23, 1959. Instead, pursuant to the memorandum agreement with Pacific, petitioner and CBS each delivered a certified check for $4,375,000 to Pacific along with a stock certificate evidencing 4,000 shares of the capital stock of POP endorsed for transfer. For its part Pacific delivered a signed counterpart of an instrument executed by the bank releasing petitioner and CBS from all liability under the continuing guaranty.

The release, subscribed October 23, 1959, recites that the bank had "made an arrangement with a person or persons, other than Guarantors or either of them," whereby the bank "has agreed to release the said Guarantors, and each of them, of and from any and all liability" to the bank "arising out of or by reason of or based upon or connected with" the continuing guaranty. On the same day, the bank was paid $5 million; the bank assigned to Pacific two notes of POP for a total sum of $1,750,000 and marked notes of $3,250,000 paid; and $3,750,000 of U.S. tax exemption certificates yielding 4.53-percent interest due June 22, 1960, were deposited and retained by the bank as security for the balance of the POP borrowings which bore interest at the rate of 4 percent.

POP's loans from the bank were not paid in full until the middle of 1960, and interest was paid on the debt up to that date. The record does not indicate that the bank considered the loans paid. Rather, a memorandum of the bank's finance committee, dated October 28, 1959, indicates that a secured loan for the unpaid balance was substituted and, as noted, the release by the bank of petitioner and CBS from the guar-

anty agreement states that the bank had "made an arrangement with a person, other than Guarantors or either of them" as to the guaranty.

It is thus clear that as of October 23, 1959, "all indebtedness" of POP to the bank had not been "paid in full." Under the terms of the continuing guaranty agreement, therefore, petitioner had no "right of subrogation" and no "right to enforce any remedy" which the bank had against POP. The release of the guaranty, therefore, gave petitioner no claim against POP to contribute to POP's capital.

Nor do we accept, for two reasons, respondent's argument that Pacific was simply a conduit for the payments to the bank, utilized solely for tax-avoidance purposes, and that the payment "in form" to Pacific "was in substance a payment to the Bank of America and must be treated as such for Federal income tax purposes."

First, the evidence is clear that petitioner and CBS had diligently tried to dispose of their interest in POP for less than the full amount payable under the guaranty. After the disastrous summer of 1959 and after receiving the Marco Engineering report, petitioner carefully canvassed various possible ways of terminating its relationship with POP, including: (1) Bankruptcy of POP, but it was believed that this would have incurred large liabilities of POP to lessees and concessionaires estimated at $6,240,000 in the event of a shutdown on October 4, 1959; would have resulted in severely injuring the business reputation and goodwill of petitioner and CBS; and, ultimately, would have produced nothing for petitioner on liquidation; (2) sale of the stock to a corporation newly formed by the lessees and concessionaires, but negotiations failed to interest the lessees and concessionaires in such a proposal; (3) sale of petitioner's stock interest to CBS, but efforts to interest CBS failed; and (4) sale of all of POP's stock to a third party, the course which was finally followed.

Petitioner and CBS accepted Pacific's offer only as a last resort. A number of prospective purchasers were contacted and offered a package deal: "Take the POP stock, secure our release from the guaranty, and we will pay $6,950,000." The only purchaser who could be interested was Pacific. The evidence is clear that, in the negotiations leading to the transaction between petitioner and Pacific, Pacific tried to exact as high a payment as possible, and petitioner and CBS tried to make as small a payment as possible for the release. If the transaction had been consummated at the initial negotiating figure of $6,950,000, quite obviously no right of subrogation would have existed for anyone until the guaranteed debt was paid in full. The fact that petitioner and CBS subsequently had to settle for payment to Pacific of an amount equal to

the full amount of the guaranty does not alter the fact that Pacific was not approached to provide a convenient conduit.[10] "[T]he transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant." *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, 334 (1945). The amount of the consideration can hardly be determinative of the character of the transaction.

Second, we cannot recast the transaction because it involved third parties, wholly unrelated to petitioner and CBS, whose economic interests would have been substantially different if the transaction had taken the form of a direct payment by CBS and petitioner to the bank. Pacific was able to obtain the release of petitioner and CBS from the bank without full payment of the guaranty, by paying $5 million and securing the balance with U.S. tax exemption certificates. The outstanding $3,750,000 loan, which was not paid off until the middle of 1960, bore interest at 4 percent per annum while the tax-exempt certificates bore interest at the rate of 4.53 percent. This spread of interest rates allowed Pacific to receive approximately $113,250 in interest while POP was paying approximately $100,000 in interest to the bank. Moreover, the probability that POP would eventually be liquidated through bankruptcy was real in October 1959. If petitioner and CBS had paid POP's full liability to the bank, they would have been entitled as subrogees to share in the liquidation proceeds absent a relinquishment of such right. Under the arrangement as negotiated by the parties Pacific acquired this right upon paying the full amount of the debt.[11] As assignee of the notes in the total amount of $1,750,000, Pacific immediately became a creditor of POP to this extent. Since all the parties—petitioner, CBS, Pacific, and the bank—were dealing at arm's length, these factors cannot be ignored. We cannot, by manipulation of the tax law, preclude the parties from exercising business judgment as to the form in which their transactions will be cast when alternate forms have such disparate business and legal consequences.

---

[10] Edmund W. Pugh, Jr., vice president, Finance, of CBS at the time of the transaction in issue, testified as follows on cross-examination:

"Q. Mr. Pugh, you paid Mr. Morehart, rather L.A.T.C. and CBS did, eight and three-quarter million dollars for the release of the guaranty. Was there any reason why these funds were not paid directly to the bank for the release of the guaranty?

"A. The reason that it developed this way was that we started talking about a payment of roughly seven million dollars to Mr. Morehart, which coupled with the stock would be in effect an exchange for the release, and that was the framework of our discussion deal with Mr. Morehart. The main variable in the deal was the amount, starting with about seven million and eventually moved on up to a higher figure, and that's why we ended up with that deal, because that was the initial framework of it and we just followed the logical consequence of that deal."

[11] A balance sheet of POP as of Sept. 30, 1960, almost a year after petitioner and CBS had severed their connections with POP, shows debts due stockholders of $8,650,000.

Respondent's final argument in support of capital loss treatment of the $4,396,000 is that, even if we find petitioner did not make a capital contribution prior to October 23, 1959, and that petitioner did not make a capital contribution on October 23, 1959, the doctrine of *Arrowsmith* v. *Commissioner*, 344 U.S. 6 (1952), requires the conclusion that the loss suffered by petitioner upon payment of $4,396,000 was a capital loss. He contends that this result follows from the fact that petitioner transferred its stock interest in POP and the cash payment in a single transaction.

We think this argument ignores the realities of the October 23 transfers. Although both transfers evolved from the single plan of petitioner to rid itself of all connection with POP, it is clear that Pacific was not needed to obtain the release from the guaranty. As we have discussed in detail, however, this does not mean that Pacific was merely a conduit which may be disregarded; the form utilized to carry out the transaction substantially affected the rights and obligations of Pacific, Bank of America, CBS, and petitioner. Nevertheless, the true nature of the transaction makes clear that the cash paid for the release must be severed from the stock transfer. Thus, the doctrine of *Arrowsmith* v. *Commissioner*, *supra*, is inapplicable. The payment of $4,396,000 involved here was not the result of a capital transaction. Rather, the genesis of the payment was the release from contingent liability under the guaranty. See *J. J. Shea*, *supra* at 581.

Our conclusion that petitioner's payment of $4,396,000 was not a capital loss leaves for resolution the question whether petitioner's expenditure qualifies as a loss under section 165(a) as it claims, or only as a bad debt under section 166 (with the requirement that petitioner prove the debt was worthless) as claimed by respondent.

By its terms, section 166(a) applies only to "debts." Since we have held that petitioner did not acquire a "debt" under the California law of subrogation it seems clear that section 166 is inapplicable. Respondent contends, however, that even if petitioner had no right of subrogation under California law, the loss incurred on payment of the $4,396,000 is deductible only under section 166. He contends that "bad debts" within section 166 include not only debts created by direct loans, but also "by any indirect endorsement or other type of arrangement which creates liability on the part of a corporate stockholder, whether or not the stockholder has the right of subrogation."

*Putnam* v. *Commissioner*, *supra*, does not support the view that Congress intended to override State definitions and applications of the doctrine of subrogation. Indeed, the Court stated that "There is not involved here a question of the effect of state law upon federal tax treatment of Putnam's loss." 352 U.S. at 85 fn. 8. Nor do we agree with

# 560

respondent that the enactment of section 166(f)[12] signifies such intent. The only language in that section which could possibly evidence this congressional purpose is that allowing a deduction upon payment by a guarantor "in discharge of * * * part of his obligation as a guarantor." This language might be read to impose bad debt treatment even when State law would give no right of subrogation. However, the legislative history does not support this reading.

Section 166(f) was added to the 1954 Code by the Senate Finance Committee, which described the applicability of this language in the following terms: "Thus a taxpayer who makes only a partial payment in discharge of his obligation as a guarantor (*the other portion of the original debt having been collected from the borrower*) may treat such payment as being within subsection (a)(2) if the taxpayer can establish that the remaining obligation of the borrower to the person to whom the taxpayer makes payment was worthless at the time of such payment." (Emphasis added.) S. Rept. No. 1622, 83d Cong., 2d Sess., p. 200 (1954). The apparent exception found in the language of section 166(f) thus actually refers to a situation where subrogation would exist since the creditor received full payment. Moreover, section 166(f) is a narrowly drawn section, by its own terms inapplicable to this case. It applies only to payments by a taxpayer "other than a corporation" and then only to payment of a noncorporate obligation. Its purpose is to remove these payments from the "nonbusiness debt" provisions of section 166—provisions inapplicable in any case to a corporation.[13]

Since petitioner suffered a noncompensated loss in 1959, not within the provisions of section 166, it follows that it is entitled to deduct

[12] SEC. 166. BAD DEBTS.

(f) GUARANTOR OF CERTAIN NONCORPORATE OBLIGATIONS.—A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment.

[13] When sec. 166(f) was enacted, Congress had available a number of cases wherein this and other courts had referred to local law to determine the existence or nonexistence of a debt. See, e.g., *E. A. Roberts*, 36 B.T.A. 549 (1937); *Humphrey* v. *Commissioner*, 91 F. 2d 155 (C.A. 9, 1937); *Sterling Morton*, 38 B.T.A. 1270 (1938), affd. 112 F. 2d 320 (C.A. 7, 1940); *William Park*, 38 B.T.A. 1118 (1938), affd. 113 F. 2d 352 (C.A. 3, 1940); *Howell* v. *Commissioner*, 69 F. 2d 447 (C.A. 8, 1934). See also *J. C. Bradford*, 22 T.C. 1057, 1069 (1954), reversed on other grounds 233 F. 2d 935 (C.A. 6, 1956); *Putnam* v. *Commissioner*, 352 U.S. 82 (1956) (referring to Iowa law as to subrogation). Had Congress intended to overrule this long-standing analysis we do not think it would have done so through the medium of a section such as 166(f) and without express indication of its intention to do so. "To the extent the Code grows in complexity and detail, the courts must be careful not to attribute to Congress overall purposes or meanings not reflected in the statutory language or clearly demonstrated in the legislative history." *Nassau Lens Co.* v. *Commissioner*, 308 F. 2d 39, 47 (C.A. 2, 1962) (Marshall, J.).

the $4,396,000 payment under section 165(a) as claimed. Cf. *Spring City Co.* v. *Commissioner*, 292 U.S. 182 (1934); *J. J. Shea, supra; Eugene H. Rietzke, supra; D. J. Condit*, 40 T.C. 24 (1963), affd. 333 F. 2d 585 (C.A. 10, 1964).

Turning to the transfer of the POP stock to Pacific, it is clear from the preceding discussion that the release cannot be treated as consideration for the transfer. However, it is equally clear that there was a reason for the transfer, which respondent has denominated "goodwill." The testimony of officers of petitioner and CBS supports respondent's view, and petitioner does not contest that goodwill was an important consideration, permeating the entire transaction.[14]

Respondent contends that, by reason of the stock transfer, petitioner acquired goodwill. Relying on *United States* v. *Davis*, 370 U.S. 65 (1962), and *Welch* v. *Helvering*, 290 U.S. 111 (1933), respondent argues that the value of the goodwill acquired was equal to the fair market value of the POP stock (which, respondent contends, must be presumed to be its adjusted basis for lack of evidence to the contrary), and, therefore, that no loss was suffered. As petitioner notes, however, the tax law distinguishes between payments made to *protect* goodwill and payments made to *acquire* the same. Payments made to protect goodwill are deductible as business expenses under section 162, if there is sufficient connection between the payment and the taxpayer's business to constitute it as "ordinary and necessary." See *United States* v. *E. L. Bruce Co.*, 180 F. 2d 846 (C.A. 6, 1950); *L. Heller & Sons, Inc.*, 12 T.C. 1109 (1949); *Catholic News Publishing Co.*, 10 T.C. 73 (1948); *Scruggs-Vandervoort-Barney, Inc.*, 7 T.C. 779 (1946); cf. *James L. Lohrke*, 48 T.C. 679 (1967); *Grauman* v. *Commissioner*, 357 F. 2d 504 (C.A. 9, 1966), affirming a Memorandum Opinion of this Court. It is undisputed that such connection existed here. Petitioner is entitled to the claimed deduction.

Where payment of an ordinary and necessary business expense is made by transferring a capital asset, the amount of the deduction is the fair market value of the asset transferred. If this amount is less than the tax basis of the asset transferred, the taxpayer also sustains

---

[14] Dwight Whiting, a director of petitioner since its inception, testified as follows:

"Now, remember one thing I didn't bring out, the image of Santa Anita Park is as fine an image of a race track as existed or ever existed in this country or anywhere else * * * We got out such as Vanderbilts and Whitneys and all the top names practically, all based on the reputation of Santa Anita for fair play and no monkey business about cheating or drugging or conniving, we had it carefully watched. We had a wonderful reputation, we still have. If we hadn't seen this P.O.P. thing through and kept it operating, we would have spoiled that image, we would have had a lot of lawsuits, we would have been called 'no good renegers.' These people we brought in, such as U.S. Rubber, Union Oil, would have been tarred with a brush, it would have been very bad for Santa Anita, which would have been published all over the country and given a twist here and there the wrong way. It would have been very bad for our enterprise of Santa Anita. We had to do it, we couldn't keep it going."

a capital loss measured by the difference; it is as if the taxpayer had sold the asset and used the proceeds to pay the expense. *Montana Power Co.* v. *United States*, 171 F. Supp. 943, 945 (Ct. Cl. 1959); cf. *United States* v. *General Shoe Corporation*, 282 F. 2d 9 (C.A. 6, 1960). Since petitioner has not shown that its POP stock had any fair market value—indeed, it has argued that the stock had no fair market value— its loss is limited to the capital loss of $900,000 claimed.

Since we hold that petitioner is entitled to a long-term capital loss on the transfer of the POP stock to protect petitioner's business reputation, we need not consider its alternative argument that the POP stock became worthless in 1959.[15]

Because of certain concessions made by the parties,

*Decision will be entered under Rule 50.*

---

[15] At trial, respondent offered certain evidence as to transactions which took place in years subsequent to 1959 in an effort to prove that the POP stock was not worthless in 1959. Petitioner objected to its admission on the ground of relevancy, and we reserved decision. We have concluded that the evidence is admissible, with the remoteness of the transactions going to its probative value. Cf. *J. K. Downer*, 48 T.C. 86, 94–95 (1967). In view of our decision, we think no further discussion of this evidence is necessary.