RAYMOND C. TEAKLE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent ALBERT W. TEAKLE and CATHERINE TEAKLE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Teakle v. Commissioner
Docket Nos. 10124-75, 10153-75.
United States Tax Court
T.C. Memo 1977-380; 1977 Tax Ct. Memo LEXIS 66; 36 T.C.M. (CCH) 1542; T.C.M. (RIA) 770380; October 31, 1977, Filed *66 Held, petitioners' guarantees of a line of credit for and accounts payable of Windor, Inc., were not indirect contributions to Windor's capital; required payments of the guarantees gave rise to bad debts. Held, further, the bad debts arising out of payments on the guarantees were nonbusiness bad debts deductible under sec. 166(d)(1), IR.R.C. 1954. Garth L. Scallon and Richard G. Worden, for the petitioners. William E. Saul, for the respondent. *67 DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: In these consolidated cases respondent determined deficiencies in Federal income tax of Raymond C. Teakle (Raymond) and Albert W. Teakle and Catherine Teakle, husband and wife (Albert), [1] for the calendar years and in the amounts as follows: Docket No.
Petitioner
Year
Deficiency
10124-75
Raymond C. Teakle
1971
$10,560
1972
11,352
10153-75
Albert W. Teakle
1971
9,682
and Catherine Teakle
1972
8,433
Concessions having been made by the parties [2] only two issues remain for decision: (1) Whether payments made by petitioners as guarantors of certain corporate debts represent indirect contributions to the capital of the corporations or gave rise to bad debts and, if the latter, (2) Whether the payments are deductible as business or nonbusiness bad debts. FINDINGS OF FACT Certain facts have been stipulated and are so found. *68 Albert and his wife and Raymond were residents of Sacramento, Calif., at the time the petitions herein were filed. They filed their Federal income tax returns with the Western Service Center, Ogden, Utah, and their 1972 Federal income tax returns with the Internal Revenue Service Center, Fresno, Calif.
California Builders Supply Co. (CBS), a California corporation located in Sacramento, is owned by Raymond and Albert. [3] From 1958 through 1972 CBS elected to be taxed as a "small business corporation" under the provisions of sections 1371 et seq., I.R.C. 1954 (subchapter S). [4]
From 1963 through 1972, petitioners' shares of net income or loss were: Year
Raymond Albert
1963
$ 3,917
$ 695
1964
( 170)
( 30)
1965
316
55
1966
18,006
12,766
1967
75
52
1968
15,010
10,477
1969
12,359
8,625
1970
11,193
7,814
1971
106,079
74,021
1972
96,309
67,225
*69 Raymond and Albert were employed as CBS' president and vice-president, respectively, during the following years and received the following annual salaries from CBS: Year
Raymond Albert
1963
$ 11,100
1964
12,000
1965
12,000
1966
12,000
12,000
1967
15,600
15,600
1968
18,000
16,400
1969
22,000
22,000
1970
$ 24,000
$ 24,000
1971
24,000
24,000
1972
27,000
27,000 Before 1966 Albert was president of Arden Door and Millwork which was co-owned by Albert and Raymond. It ceased operations in 1966. The principal business of CBS is wholesaling building supplies and materials. In the early 1960's CBS purchased manufactured parts (KD parts) for windows from Radco Products, Inc. (Radco) in Santa Maria, Calif. The KD parts were assembled and glazed by CBS and sold by it to its customers as Radco Weatherlock windows. In the early 1960's Radco developed a licensing program whereby the licensees purchased aluminum extrusions from Radco and manufactured them into finished Radco windows and other Radco products. Windor, Inc. (Windor), was formed by the Smiths and became a licensee of Radco for the Sacramento area. At that time neither Radco nor *70 CBS nor the owners of either had any ownership interest in Windor. In about 1963, CBS began purchasing fully assebled Radco windows from Windor. CBS was short of space for either assembling the KD kits or for manufacturing the extrusions into finished windows and made no effort to become a Radco licensee; it suited the business purpose of CBS better to purchase the finished windows from Windor then to assemble the KD kits or manufacture the finished windows. After 1963 CBS continued to buy some products directly from Radco but this diminished as Windor's operations expanded. For the years 1963 through 1970, CBS' sales of aluminum products and total sales were as follows: Sales of Year
aluminum products
Total sales
1963
$100,874
$1,227,881
1964
85,814
1,173,878
1965
84,054
1,317,860
1966
87,717
1,172,397
1967
92,575
1,339,280
1968
83,256
1,696,975
1969
76,513
1,784,676
1970
72,572
1,660,028 From 1963 through 1968,85 to 90 percent of the aluminum products sales were of Radco aluminum windows. For some time prior to June 30, 1965, Windor had been experiencing financial difficulties. Radco, a major creditor of Windor, became concerned *71 and, in early 1965, initiated discussions with Raymond about involving Raymond and Albert in the management of Windor. On May 5, 1965, Radco acquired all of the issued and outstanding stock of Windor. On June 30, 1965, Windor, Radco, Raymond, and Albert entered into an agreement under the terms of which Radco transferred all of the outstanding stock of Windor (500 shares) to Raymond and Albert in consideration for their agreement to assume management and control of Windor. Radco, Raymond, and Albert gave no monetary consideration for the stock. Radco also agreed that the $85,064.83 owed to it by Windor would be payable only from Windor's after-tax net profits. Raymond and Albert's primary motivation for assuming the management of Windor was preservation of a source of supply for CBS of Radco windows. Each manufacturer of aluminum windows uses unique specifications and windoes of different manufacturers are not interchangeable. CBS and its customers had inventories of Radco windows and it was important to CBS that its source of supply be maintained. Although CBS could have acquired an assembled Radco window from Radco's licensee in Hayward, the increased cost to CBS and the *72 instability of that outlet made this option unattractive. Raymond and Albert considered Windor's stock to be valueless. As of October 31, 1965, Windor had a zero net worth. Its paid-in capital account was $5,000 and it had a deficit in its earned surplus account of $26,136. Because of the subordinated debt to Radco, they did not expect the stock to produce dividend income or appreciate until sometime in the future. Raymond and Albert were also motivated to take over the management of Windor by the prospect of salaries once they turned Windor's business around and it began to grow. Raymond received salaries from Windor during its fiscal years 1965 through 1969 of $600, $2,400, $2,400, $4,152, and $2,400, respectively. Albert received a salary of $1,753 in fiscal year 1968. Raymond devoted approximately 5 hours per week to Windor's affairs. Albert was not involved with Windor on a regular basis but consulted on and participated in management decisions. Albert expected to devote more time to Windor and receive salary income from it as Windor grew. Development of CBS was their principal objective, and the time devoted to Windor's affairs was usually after hours and on weekends. *73 William Belcher was hired by Windor as its manager shortly after petitioners acquired it and continued in this position until Windor ceased operations. As of June 30, 1965, Windor had been factoring its accounts receivable with Downey Financial but Downey was discontinuing construction industry financing. On July 30, 1965, Windor and Commercial Credit Corp. (Commercial) entered into a loan agreement whereby Windor pledged to Commercial its accounts receivable as security for loans to be made by Commercial to Windor. Raymond and Albert personally guaranteed repayment of these loans. Albert and Raymond gave the continuing guarantee because it was required by Commercial in order for Windor to borrow the funds necessary to be able to continue to manufacture the Radco window. Although $6,000 was loaned to Windor by one or both of the Teakles, Commercial's financing of Windor made it unnecessary for the Teakles to contribute capital to Windor and they did not consider doing so. For fiscal years ending October 31, 1965 through 1969, Windor's accounts receivable and loans payable to Commercial were as follows: FY ending
Accounts
Commercial Oct. 31,
receivable
loans
1965
$113,960
$ 48,160
1966
103,085
65,282
1967
123,905
82,307
1968
149,718
106,870
1969
305,159
226,843
*74 In 1969 Radco discontinued the sale of aluminum extrusions to Windor and Windor began purchasing extrusions for making windows from Reynolds Metals (Reynolds) and Harvey Aluminum (Harvey). Windor also began purchasing tub enclosure aluminum from Pacific Extrusions (Pacific) for a new product line Windor was attempting to introduce. As required by the suppliers, Raymond and Albert guaranteed payment of all of these accounts. Although he did not sign these guarantees, Albert had agreed with Raymond to share equally if any future payment was required. When the Reynolds, Harvey, and Pacific guarantees were given, Raymond and Albert still believed Windor could operate profitably. The deficit in earned surplus had been reduced to $4,644 and it had a net worth of $356. In 1969 when the three guarantees were made, Windor was still supplying Radco windows to CBS but the volume was diminishing. CBS' sales of this particular line had decreased and the majority of CBS' customers were buying directly from Windor although CBS still supplied the more remote areas of its region. Windor ceased operation in 1970 and entered into an assignment for the benefit of its creditors. [5]
*75 In 1971 and 1972, Raymond and Albert made equal payments on the guaranteed accounts in the total amounts as follows: Total
Total amount
amounts paid
of liability
1971
1972
Reynolds
$ 8,214.10
$ 4,000
Pacific
12,226.59
5,050
$7,050
Harvey
52,542.76
25,000
Commercial
75,052.54
8,000
23,954
$147,035.99
$42,050
$31,004 and claimed the payments as business bad debt deductions on their income tax returns. In the notices of deficiency respondent disallowed the deductions for the reason that the "payments represented [contributions] to capital loans" or, alternatively, were nonbusiness bad debts. OPINION Respondent argues primarily that petitioners' guarantee of Commercial's financing as well as guarantees to suppliers of Windor represented indirect contributions to the capital of Windor such that petitioners incurred a capital loss when their stock in Windor became worthless. This argument is based entirely on theory because there is nothing in the record to support it. We find it unnecessary to discuss in detail the various factors that have been enumerated in Court opinions in resolving issues whether moneys advanced *76 to a corporation represented debt or equity, see A. R. Lantz Co. v. United States,424 F.2d 1330, 1333-4, (9th Cir. 1970), because all the evidence in this case clearly shows that the payments in question made by petitioners were what they purported to be, payments on their obligations as guarantors of Windor's line of credit with Commercial and its accounts payable to its suppliers. We recognize, as we said in Santa Anita Consolidated, Inc. v. Commissioner,50 T.C. 536, 550 (1968): the fact that the advances were made in the form of guaranteed debt does not, in and of itself, negate their treatment as capital contributions. * * * but we find that the circumstances under which these guarantees were made do negate the argument that they were intended to represent indirect contributions of capital to Windor. Windor purchased aluminum extrusions from Radco and manufactured them into Radco windows, which it in turn sold to CBS. Windor was thinly capitalized and obtained operating funds by factoring its accounts receivable with Downey Financial. Windor *77 became heavily indebted to Radco for supplies and Radco took steps to protect its interests in Windor, both as a creditor and as a distributor of Radco's products. In 1965, Radco's president contacted petitioners and asked them to take over management and control of Windor. As inducement to petitioners, Radco acquired all the stock of Windor and transferred it to petitioners without other consideration, and also subordinated Windor's debt to it. Petitioners, whose principal business interest was CBS, were willing to take on management of Windor primarily to assure CBS of a continuing supply of Radco windows. They thought that with good management Windor's business could be turned around and made profitable and they had in the back of their minds that eventually Windor might become a source of salary income to them. Any thoughts they had about their Windor stock becoming valuable was remote because of the debt to Radco. Consequently, they gave no thought to contributing additional capital to Windor. Windor was able to obtain operating capital by factoring its accounts receivable with Commercial, but Commercial required petitioners to personally guarantee Windor's line of credit. *78 Petitioners were not concerned about this because they thought that with good management Windor would be able to pay its own obligations. Petitioners were successful to some extent in improving Windor's financial status until market and business conditions changed about 1969. CBS was phasing out its sales of Radco windows and Windor was selling the windows direct to former customers of CBS. Radco also terminated supplying Windor with aluminum extrusions so Windor had to look elsewhere for aluminum. It made arrangements to buy the extrusions from Reynolds and Harvey, who agreed to sell aluminum extrusions to Windor provided petitioner Raymond would guarantee payment of the purchase price. Windor also expanded into a new line of business and acquired its supplies for this line from Pacific, which also required Raymond's guarantee of Windor's account.At the time in 1969 when these guarantees were made by petitioners, Windor's financial condition was improved and they did not expect to have to pay the accounts. Unfortunately, business conditions changed rather suddenly and Windor was forced to cease operations in 1970 and make an assignment of its assets for the benefit of creditors. *79 Petitioners were therefore called upon to meet their obligations as guarantors of the unpaid indebtedness of Windor to Commercial, Reynolds, Harvey, and Pacific. Their payments on these guarantees are the amounts here involved. Petitioners at no time advanced any funds directly to Windor. [6] There was no reason or need for them to do so. Although Windor was thinly capitalized it was able to operate successfully from 1965 until 1969 without the infusion of capital. They were not interested in building up an investment in Windor; their primary motive in taking over management of Windor in 1965 was to assure a continuing supply of Radco windows to CBS. It is true that by 1969, CBS was phasing out of the Radco window business and a source of supply was no longer of much importance to it. However, by that time Windor was operating with a modicum of success, its debt to Radco had been reduced considerably, and petitioners thought it could continue in business successfully without the need for additional capital. It was to assure Windor of a source of supply of raw materials for its business that petitioners agreed to guarantee Windor's accounts to its suppliers. *80 Since petitioners made no advances directly to Windor and made no payments on Windor's debts until 1970, they could have made no contribution to Windor's capital until 1970. At that time Windor had ceased operations and had made an assignment for the benefit of its creditors. When they were called upon to make payments under the guarantee agreements it strains credibility, in light of their experience as successful businessmen, to think petitioners were making the payments to save Windor. They had no investment in Windor to save and Windor was no longer a factor in the business of CBS. The payments were what they purported to be--payments of their obligations as guarantors. We learn from Putnam v. Commissioner,352 U.S. 82 (1956), that-- instanterupon the payment by the guarantor of the debt, that debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, but, by subrogation, the result of the shift of the original debt from the creditor to the guarantor who steps into the creditor's shoes. Thus, the loss sustained by the *81 guarantor unable to recover from the debtor is by its very nature a loss from the worthlessness of a debt. * * * [fn. ref. omitted] Also that-- the statutory scheme is to be understood as meaning that a loss attributable to the worthlessness of a debt shall be regarded as a bad debt loss, deductible as such or not at all. Thus, it is clear that any deductions to which petitioners are entitled must be provided by section 166 of the Code, which allows a deduction for bad debts. [7]Sec. 1.166-8(b), Income Tax Regs.
Section 166(a) provides that there shall be allowed as a deduction any debt *82 which becomes worthless within the taxable year. Section 166(d), however, provides that, in the case of a taxpayer other than a corporation, subsection (a) shall not apply to any nonbusiness bad debt, and that the loss resulting from a nonbusiness debt becoming worthless within the taxable year shall be considered as a short-term capital loss. Subsection (d)(2) defines a nonbusiness debt as one other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. Petitioners argue that the payments gave rise to debts which were business bad debts the loss from which was deductible in full under section 166(a). Respondent argues, in the alternative, that if the payments gave rise to debts they must be considered to be nonbusiness debts the loss from which is deductible only as short-term capital losses under section 166(d). We agree with respondent. An appropriate application of section 166 to taxpayers occupying the dual status of shareholder and employee has been examined with frequency by the courts and difficult, *83 although not insurmountable, hurdles to ordinary loss treatment have been judicially promulgated. In order to establish that these debts were business debts petitioners must prove that these guarantees were proximately related to their trade or business at the time they were made. Without question, a taxpayer's trade or business can be that of being an employee. Primuth v. Commissioner,54 T.C. 374 (1970); Gould v. Commissioner,64 T.C. 132 (1975). Petitioners had no other business than that of being employees. Thus for petitioners to prove that these were business bad debts they must show a direct nexus between their business of being employees and their guarantees of Windor's obligations. Sec. 1.166-5(b), Income Tax Regs.; Fench v. United States,487 F.2d 1246, 1248 (1st Cir. 1973). And a distinction must be drawn between the business of a corporation and that of its employees. In Whipple v. Commissioner,373 U.S. 193, 202 (1963), the Supreme Court said: *84 Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation. Even if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business. In a situation *85 such as this involving shareholder/employees, the proximate relation standard requires a showing that the dominant motivation of petitioners in making the guarantees was the protection of petitioners' business of being employees and not their investment. See United States v. Generes,405 U.S. 93, 104 (1972). Initially, petitioners have failed to prove that the guarantees of Windor's obligations were primarily related to their business of being employees. Both petitioners testified that their primary reason for guaranteeing Windor's line of credit with Commercial was to assure CBS of a source of supply of Radco windows. Thus this guarantee was made to protect the business of CBS, not their own businesses. And it is clear from all the evidence that the guarantees of the Reynolds, Harvey, and Pacific accounts in 1969 were to provide Windor with a supply of raw materials for its products. Again the guarantees related to the business of Windor, not their businesses. And the business of the corporations is not the business of the employees. While it cannot be said that *86 shareholder/employees of closely held corporations automatically are precluded from the business bad debt category, Whipple and Generes undoubtedly make it more difficult to attain. Petitioners were not in a trade or business separate from that of being employees of CBS. Hence, the evidence presented fails to support their argument that the guarantees were made in connection with their businesses. Furthermore, even if we assume that the guarantees were made to benefit petitioners' status as shareholder/employees petitioners must prove that their employment, if any, by the corporations constituted a trade or business and that the dominant motive in making the guarantees was to protect that business rather than to protect their investment in the corporations. In this case, petitioners were owners and employees of CBS, a wholesaler of building supplies.It was to insure a source of Radco windows for CBS's customers that induced petitioners to assume ownership and management of Windor and execute the Commercial guarantee agreement.Consequently, petitioners' relationship to CBS and not to Windor should be the focus of investigation with regard to payments pursuant to the *87 Commercial guarantee. Recognizing this, petitioners argue that their respective roles in CBS when the Commercial guarantee was made were more "significantly" that of employee than that of shareholder. They point out that Raymond's salary from CBS in 1963, 1964 and 1965 was, $11,100, $12,000, and $12,000, respectively while his pro rata portion of income or loss from CBS by reason of its subchapter S status was $3,917, ( $170), and $316, respectively. Albert was not employed by CBS during the years 1963-1965 but rather by Arden Door and Millwork. Because Arden Door and Millwork ceased operations sometime after the takeover of Windor, Albert argues that he anticipated that his salary from CBS would, in the near future, be his primary source of income. He also argues that his pro rata share of income or loss from CBS during 1963 through 1965, $695, ( $30) and $55, respectively, was so minimal as to make it unreasonable to assume that he would sign the Commercial guarantee to protect that investment income. Respondent correctly counters the above with the assertion that the record does not support the arguments. There is no testimony that petitioners were concerned that their *88 jobs with CBS would be jeopardized if the Commercial guarantee were not executed. Indeed the evidence strongly supports the finding that CBS' business relations with its customers was the primary, if not the sole, reason for becoming involved with Windor in the first place. However, even though sales of Radco windows comprised 85 to 90 percent of CBS' aluminum product sales, during 1963 through 1965, the aluminum product sales comprised only 6 to 8 percent of CBS' total sales. Consequently, it is unlikely that the loss of this market would have destroyed CBS and with it petitioners' jobs. We conclude that the guarantee of Windor's line of credit with Commercial gave rise to a nonbusiness bad debt. With regard to the Reynolds, Harvey, and Pacific guarantees, the more appropriate point of reference is petitioners' status with, and relationship to Windor. By 1969, when these guarantees were executed, CBS was no longer buying from Windor in large volume, having switched some former customers to dealing directly with Windor for the Radco window. Consequently, protection of CBS was no longer the primary focus of petitioners' endeavors with regard to Windor. Because petitioners were *89 receiving salary income from Windor and because the salaries, however small, exceeded the value of the Windor stock, petitioners argue that ordinary losses resulted from these guarantees. This Court has held that if the occupation of the party involved so consists of expenditures of time, money, and effort as to constitute his business life, it is that person's trade or business. Ferguson v. Commissioner,16 T.C. 1248, 1257 (1951). Petitioners' involvement in the day-to-day activities of Windor was minimal at best. In fact, Windor hired a full-time manager. Petitioners possibly expected to devote more time to, and draw larger salaries from, Windor as the corporation became rehabilitated and grew. It is true that in 1969, Raymond was drawing a small annual salary from Windor. Albert, on the other hand, drew a salary in 1968 only and did not recall so doing. Although Windor's business was improving in 1969, neither Albert nor Raymond was expending much effort in terms of time or cash outlay toward furthering that improvement. Petitioners' primary concern in 1969 was *90 still CBS although they may have hoped for salaries from Windor in the future. However, the level of their activity for, and the salaries earned from, Windor in 1969 do not justify a finding that being an employee of Windor constituted a trade or business of petitioners at that time. But even if employment with Windor could be considered a business of petitioners, the record would not support a finding that petitioners' guarantees of Windor's accounts payable were dominantly motivated to protect their jobs with Windor rather than their ownership interest therein. Thus we must conclude that the guarantees of the accounts payable of Windor also created nonbusiness bad debts. Petitioners' losses resulting from all of the guarantees are deductible under section 166(d)(1). Decisions will be entered under Rule 155. Footnotes
1. Because Catherine Teakle did not particiipate in any of the events in this case, future references will be to her husband only.↩
2. Because of these concessions, a computation under Rule 155 will be necessary.↩
3. Other members of the Teakle family have owned stock in CBS, but from Mar. 30, 1965, to Jan. 1, 1966, petitioners owned the majority interest. From Jan. 1, 1966, to Dec. 31, 1970, they were the sole shareholders. ↩
4. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise specified.↩
5. It is stipulated that Radco executed a consent to the assignment for the benefit of creditors on September 17, 1970, and that a copy of the consent is annexed as exhibit 18-R. That exhibit is dated August 10, 1970, and is a consent by Radco, as a creditor of Windor, to extend the time of payment of its claim against Windor. It contemplates other creditors doing the same. There is no documentary evidence that Windor entered into an assignment for the benefit of creditors, but oral testimony suggests that it did.↩
6. Except a small amount apparently advanced when petitioners first took control of Windor about which we have no evidence.↩
7. The parties agree that if the payments are not to be regarded as contributions to capital, the deduction allowable will be governed by sec. 166. No argument has been advanced, as it was in Santa Anita Consolidated, Inc. v. Commissioner,50 T.C. 536↩ (1968), that because of State law petitioners did not acquire a "debt" when they paid the guarantees.